IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

JOHNNY KIMBLE

    Plaintiff,

v.                                          Case No. 07-C-0266

WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT, and
J. SHEEHAN DONOGHUE,

    Defendants.

DEFENDANTS' FINDINGS OF FACT AND CONCLUSIONS OF LAW

FINDINGS OF FACT

    1.    Plaintiff Johnny Kimble ("Kimble"), an African-American male, brings this action claiming that the defendants unlawfully discriminated against him on the basis of race and sex when they failed to give him discretionary raises, while giving such raises to others similarly-situated.

    2.    Defendant J. Sheehan Donoghue ("Donoghue") was the Administrator of the Wisconsin Department of Workforce Development ("DWD") Equal Rights Division from 1991 to January 6, 2003, the date of her retirement.

    3.    The DWD acts as the labor department for the State of Wisconsin and conducts a variety of work-related programs designed to connect people with employment opportunities in Wisconsin. It has major responsibility for the state's employment and training services, job centers, job training and placement services provided in cooperation with private sector

employers, apprenticeship programs, and employment-related services for people with disabilities. It oversees the unemployment insurance and worker's compensation programs, and is also responsible for adjudicating cases involving employment discrimination, housing discrimination , and labor law.

4. The Equal Rights Division, one of seven divisions that comprise the DWD, is at issue in this case. The Equal Rights Division, through its Bureau of Civil Rights, enforces state laws that protect citizens from discrimination in employment, housing, and public accommodations. It also administers the enforcement of the state Family and Medical Leave Law. The Labor Standards Bureau of the Equal Rights Division enforces state labor laws relating to hours, conditions of work, minimum wage standards, and timely payment of wages. It also determines prevailing wage rates and enforces them for state and municipal public works projects not including highway projects. The Labor Standards Bureau also enforces child labor laws and the state plant closing law.

5. At all times material, Kimble was employed by the Bureau of Civil Rights, Milwaukee Equal Rights Office. Civil Rights Bureau Director LeAnna Ware was Kimble's immediate supervisor, and defendant J. Sheehan Donoghue was at all times material the Equal Rights Division Administrator. Robert Anderson is the Director of the Bureau of Labor Standards.

6. Under Wisconsin law during the period between July 1, 1999 and June 30, 2003, the compensation of state employees who were not covered by a collective bargaining agreement, such as supervisors in DWD's Equal Rights Division, was governed by two successive biennial state compensation plans issued by the Wisconsin Department of Employment Relations under the authority of Wis. Stat. § 230.12.

7. The state compensation plan for state fiscal years 1999-2001 was effective from July 1, 1999 through June 30, 2001. In Section A, General Compensation Provisions for Nonrepresented Permanent and Project Employees in the Classified Service, the plan contains provisions for Performance Recognition Awards and Performance Recognition Payments. The plan states that awards or payments under these provisions are to be based primarily on merit, as determined by the appointing authority, and also states that other recognized compensation factors, including but not limited to equity and retention, may also be considered.

8. Section J of the state compensation plan for state fiscal years 1999-2001 also applied to supervisors in DWD's Equal Rights Division. Part 5.00 of Section J describes Discretionary Compensation Adjustments, and states that the concept of the adjustment is to provide the appointing authority with the discretion to provide economic recognition for significant and permanent changes in job duties, increased competencies, or to address pay equity or retention needs.

9. The state compensation plan for state fiscal years 2001-2003 was effective from July 1, 2001 through June 30, 2003. In Section A, General Compensation Provisions for Nonrepresented Permanent and Project Employees in the Classified Service, the plan contains a provision which states that Discretionary Compensation Adjustments and Discretionary Compensation Performance Recognition Adjustments shall be granted in accordance with Section J of the plan.

10. Part 2.00 of Section J of the state compensation plan for state fiscal years 2001-2003 describes Discretionary Compensation Adjustments and states that the concept of the adjustment is to allow the appointing authority the discretion to provide economic recognition to employees for significant and permanent changes in job duties, increased competencies, or to

- 3 -

address pay equity or retention needs. Parts 3.00 and 4.00 of Section J describe the Discretionary Compensation Performance Recognition Adjustment and the Discretionary Compensation Performance Recognition Payment. For each of these, the concept is described as allowing the appointing authority the discretion to provide economic recognition to an employee for meritorious service.

11. LeAnna Ware is employed by the DWD as the Civil Rights Bureau Director, and she has held that position since February 1992. The Bureau of Civil Rights investigates discrimination, harassment in the workplace (including sexual harassment), retaliation protection, and Family and Medical Leave complaints.

12. In her capacity as Bureau Director, Ware supervised the Hearing and Mediation Section, the Milwaukee Civil Rights Office, and the Madison and Upstate Civil Rights Offices. As such, Ware was Johnny Kimble's direct supervisor from February 1992 until his retirement on May 2, 2005.

14. From 1979 to his retirement, Johnny Kimble was employed by DWD as the supervisor of the Milwaukee Civil Rights Bureau. Kimble's official classification changed to Section Chief in 1998. The duties and responsibilities of Kimble's position are summarized as:

> "Under the general direction of the CR Bureau Director, manages professional staff throughout the state. Directs and coordinates the units' responsibilities in the investigation and settlement of the major laws against discrimination statewide, including case review, timeliness monitoring and problem-solving production issues. This position includes interpretation of new laws, issuance of manuals and policy directives and development of materials explaining laws and regulations statewide."

15. During the time that Sheehan Donoghue was Administrator of the Equal Rights Division, Ware never had the opportunity to recommend anyone for a Discretionary Compensation Award (DCA).

16. Ware understood that the Equal Rights Division had very limited funds available for such awards and, therefore, only persons who had made extraordinary contributions above and beyond their position descriptions or had very outstanding performance in all aspects of their positions were considered for such awards. Ware has never taken the initiative to recommend any supervisor who reported to her for a DCA.

17. However, even had unlimited discretionary funds been available, Ware would not have recommended Johnny Kimble for such an award. Although Kimble was certainly a valued member of the Civil Rights Bureau, and had strengths in many areas, Ware never advocated for Mr. Kimble because she did not believe his overall performance merited an award.

18. Kimble was employed as a supervisor in the Equal Rights Division and as such he did not have monthly and annual productivity goals. His annual goals were established at the time of his Goals and Accomplishment Review.

19. Kimble never produced high-quality written work free of major errors in grammar, spelling or sentence structure, despite a continuing goal to improve his writing and proof-reading skills in each of his reviews beginning in 1993. This failure made it impossible for Ware to delegate to him responses to important letters from legislators or other outside persons who wrote to the Equal Rights Division requesting information. Ware also could not rely on Kimble to write policies or procedures without assistance, even though this was a major responsibility of his position.

- 5 -

Case 2:07-cv-00266-LA   Filed 06/29/09   Page 5 of 13   Document 74

20. Kimble's difficulty with proof-reading also made him ineffective in another major responsibility of his position. He was unable to coach staff who reported to him in producing clear, concise initial determinations that were understandable and free of major grammatical or spelling errors.

21. In a memo dated February 4, 1994, Ware expressed concerns to Kimble that he did not always communicate important information about changes in policies and practices in the Milwaukee office. Even though Kimble and Ware spoke daily by telephone, she frequently found out about issues in the Milwaukee office from staff, rather than from Kimble. Each of his reviews mentioned the need for Kimble to communicate to Ware any developing problems. While communication between the two improved during some years, Ware's concerns about the lack of timely information she received from Kimble continued throughout his employment.

22. During the period of time Ware supervised Kimble, she neither recommend him for a merit increase nor was she asked by the Equal Rights Division Administrator to recommend or consider whether he should be given an increase in pay.

23. As the Division Administrator, Donoghue was responsible for the administration of all of Wisconsin's Civil Rights laws including, but not limited to, the Fair Employment Law, the Fair Housing Law, the Family and Medical Leave Law, as well as the oversight and enforcement of the contract between the State of Wisconsin and the Federal Equal Employment Opportunity Commission (EEOC). Donoghue was also responsible for the enforcement of all of the Wisconsin Labor Laws including, but not limited to, the Plant Closing Law, the Minimum Wage Law, the Child Labor Law, and all of the Prevailing wage Laws.

24. As the Administrator of the Equal Rights Division (ERD), Donoghue was the direct supervisor of the two Bureau directors, as well as the direct supervisor of the program

support section chief. In addition, she not only met on a regular basis with the EEOC regarding the contract numbers, but she closely monitored the federal contract that we had with the EEOC to ensure that we complied with our contract terms and production numbers. Donoghue was responsible for monitoring performance and production issues, as well as all personnel problems within the ERD.

25. The Equal Rights Division (ERD) is comprised of two bureaus: The Bureau of Civil Rights and the Bureau of Labor Standards. The Bureau of Civil Rights investigates Employment Discrimination, Housing Discrimination, Sexual Harassment, Labor Standards Retaliation, and Family and Medical Leave complaints. The Bureau's Hearing Section holds hearings on appeals of initial determinations from the investigation sections and issues decisions on those administrative hearings. The Bureau of Labor Standards investigates labor standards, child labor, and plant closing complaints. It enforces the minimum wage and conducts investigations of the minimum wage when requested to do so by a member of the public. The Bureau sets the prevailing wage rate for public highway and building projects and issues work permits as well as conducting debarment hearings and actual debarment of contractors that are found to be in violation of the prevailing wage law on a public project.

26. At all times material, Kimble's civil service classification was Equal Rights Supervisor. He was section chief of the Milwaukee civil rights section that at times included an Equal Rights Officer located in the Racine Job Service Center. That section, as well as the other Civil Rights section in Madison and out-state, had the responsibility for investigating fair employment complaints, fair housing complaints, family and medical leave complaints, and labor standard retaliation complaints. At the conclusion of the investigations, the Equal Rights Officers

were responsible for the issuance of probable cause determinations. Kimble's immediate supervisor was LeAnna Ware, Bureau Director for the Civil Rights Bureau.

27. In June 1999, Donoghue awarded Kimble a Performance Recognition Award of $300.00 to acknowledge and encourage his efforts to improve his management and writing skills. This was the only discretionary award Kimble received at all times material to this action.

28. Through discovery in this case, Kimble has identified three individuals in supervisory positions within the ERD. Allegedly Kimble believes these positions and the individuals in these positions required equal skill, effort and responsibility to his position. Kimble allegedly believes that these individuals were given discretionary raises and higher rates of pay because of their race and/or sex. The individuals Kimble identified are James Chiolino, Michael Dixon and Georgina Taylor.

29. The formal civil service classification of Kimble, Chiolino, Dixon, and Taylor as the same: Equal Rights Supervisor. Chiolino and Dixon were section chiefs in the Bureau of Labor Standards. Kimble and Georgina Taylor were section chiefs in the Civil Rights Bureau. However, the job duties and skill sets required for the supervisors in the two bureaus were quite different. Chiolino and Dixon had different working titles and different duties supervising staff that enforced different laws than Kimble and Taylor.

30. James Chiolino was promoted to Equal Rights Supervisor in 1999, and remained the section chief in the Labor Standards Compliance Section for the remainder of the time Donoghue was the administrator of the ERD. Chiolino's section in Labor Standards handled general labor standards cases, minimum wage, overtime, child labor, failure to pay wages due, plant closing laws and other related labor standards laws.

31. Chiolino received an equity increase in April 2000. The following year, in May 2001, Donoghue granted Chiolino a Performance Recognition Award. Donoghue granted both the discretionary awards based on Chiolino's ongoing exemplary job performance. Chiolino's hourly pay rate was $26.236, and Kimble's hourly pay rate was $25.628 as of the date of Donoghue's retirement on January 6, 2003.

32. Michael Dixon was promoted to the Equal Rights Supervisor position in the Labor Standards Bureau in 2001, and remained section chief of the Construction Wage Rate Section for the duration of Donoghue's tenure as Equal Rights Division Administrator. The Construction Wage Rate Section specialized in setting the prevailing wage rates on public construction projects and investigated complaints alleging that the prevailing wage rate was not being paid on public projects in particular areas around the state. They conducted informational programs for employers and employees throughout the state.

33. Donoghue granted Dixon a $1.00 per hour Meritorious Performance Award effective October 6, 2002. After only one year as section chief of the construction wage rate section, Dixon had corrected both production and quality problems within the prevailing wage program. In Donoghue's opinion, Dixon's skills were critical to the success of the prevailing wage program in Wisconsin, and she had concerns that he would leave the Department for a position that paid more. Therefore, the increase in compensation not only rewarded him for his excellent performance, but it also served to ensure his retention in that position in the Division. Dixon's hourly pay rate was $26.628 and Kimble's hourly rate was $25.628 as of the date of Donoghue's retirement from state service on January 6, 2003.

34. Chiolino and Dixon cannot be considered similarly situated to Kimble. Although their civil service classification was the same as Kimble's, and each of them was responsible for

supervising staff, one cannot validly compare the two sections and their responsibilities in the Labor Standards Bureau with the two sections and their responsibilities in the Civil Rights Bureau. The sections in the Labor Standards Bureau enforce different laws and codes than do the sections in the Civil Rights Bureau. Their responsibilities and functions within the two bureaus are vastly dissimilar.

35. Kimble and Georgina Taylor, a Hispanic female, were both section chiefs in the Civil Rights Bureau. Their responsibilities in the Civil Rights Bureau were equivalent to each other, and they dealt solely with cases involving the state's civil rights, fair housing, family and medical leave, and labor standards retaliation complaints. Kimble was the Chief of the Milwaukee Investigation Section, and Taylor was Chief of the Madison/Field Investigation Section. They both supervised Equal Rights Officers whose job was to investigate complaints of the civil rights, fair housing, and, Family and Medical Leave and Labor standard retaliation laws. The Equal Rights Officers were responsible for issuing probable cause determinations for cases received from complainants throughout the state.

36. Georgina Taylor began her employment as an Equal Rights Supervisor on May 13, 1996, as the Madison/Field Investigation Section Chief, and held that position for the duration of Donoghue's tenure as the ERD Administrator until her retirement on January 6, 2003. It is Donoghue's understanding that Taylor left this position on October 18, 2004, when she was appointed the Agency Bilingual Outreach Coordinator in the Equal Rights Division.

37. Both Kimble and Taylor had similar responsibilities in their roles as section chiefs in the Civil Rights Bureau. However, Taylor's position involved more travel because of the out-of-state satellite offices of the ERD. Kimble's one employee in the Racine office traveled to Milwaukee for section meetings, and any meetings with her supervisor. Taylor participated in

translating into Spanish, several of the informational brochures that the Division made available to the general public.

38. In April 2000, Donoghue granted Taylor a salary equity award of $.50 per hour to bring her hourly pay rate of $23.983 closer to the hourly rate of pay at which Kimble was then being paid. Donoghue neither granted, nor did LeAnna Ware recommend Taylor for a discretionary compensation award during her tenure as an Equal Rights Supervisor. Taylor's compensation was always less than Kimble's during Donoghue's time as Administrator if the ERD. At the date of Donoghue's retirement on January 6, 2003, Kimble's hourly pay rate was $25.628 and Taylor's hourly pay rate was $24.828.

39. In Donoghue's opinion Kimble's performance did not warrant any additional performance recognition award following the award she gave him in 1999. Unfortunately, Kimble's performance slipped markedly after that award, and never approached a level where Donoghue would have been justified in granting another award. Discretionary funds available for providing such awards were limited, and while Kimble was a valued employee, his performance as a section chief in the Equal Rights Division was less than outstanding.

## CONCLUSIONS OF LAW

1. Kimble must address the *McDonnell Douglas* approach to establish a prima facie case of either race or gender discrimination. *Farrell v. Butler University*, 421 F.3d 609, 613 (7th Cir. 2005).

2. If he does that, the defendants then have the opportunity to come forward with evidence that there are legitimate, non-discriminatory explanations for their actions. *Id.* Once

- 11 -

Case 2:07-cv-00266-LA   Filed 06/29/09   Page 11 of 13   Document 74

they have provided such evidence, Kimble has the final chance to avoid dismissal by clearly demonstrating that the defendants' explanations for their actions are lies, pretext, or that the explanations are unworthy of belief. *Lim v. Trs. of Ind. Univ.,* 297 F.3d 575, 580 (7th Cir. 2002); *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1012 (7th Cir. 2000). *See also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Johnson v. City of Ft. Wayne,* 91 F.3d 922, 944 (7th Cir. 1996). Kimble must prove disparate treatment and an adverse employment action. *Hoffman-Dombroski v. Arlington Int'l. Racecourse, Inc.,* 254 F.3d 644, 650 (7th Cir. 2001).

      3.      The burden of proof is on the plaintiff at each stage of the analysis.

      4.      Absent direct evidence, Kimble must resort to trying to establish a prima facie case of race or gender discrimination by clearly demonstrating that he is a member of a protected class, that at the times the challenged employment decisions were made he was performing his job satisfactorily, that he suffered an adverse employment action, **and** that he was treated less favorably than at least one similarly situated employee who was not a member of the protected class. *Lim*, 297 F.3d at 580.

      5.      Proof of discrimination under § 1983 utilizes the same analysis as Title VII. *See Johnson v. City of Ft. Wayne*, 91 F.3d at 944. For his § 1983 claim, Kimble must also show willful discrimination. Johnson, 91 F.3d at 944-45.

      6.      Kimble must demonstrate that giving any kind of pay raises to other employees who he claims are similarly situated, when he does not receive a raise, is an adverse employment action. That simply is not the case, nor is it the law. *Miller v. Am. Family Mut. Ins. Co*., 203 F.3d 997, 1006 (7th Cir. 2000), citing *Smart v. Ball State University*, 89 F.3d 437, 441 (7th Cir. 1996), *Farrell v. Butler University*, 421 F.3d 609, 614 (7th Cir. 200).

7. Kimble must demonstrate that a similarly situated employee was treated more favorably because of race and/or gender. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

8. Chiolino and Dixon are different from Kimble (and Taylor), and cannot be considered to be similarly situated with Kimble, and they cannot be used to demonstrate that other non-class members were treated more favorably because of race. They worked in the Labor Standards Bureau. They had a different supervisor. They had different duties, even though their state job classifications were the same. *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 330 (7th Cir. 2002); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002).

9. Defendants have presented a non discriminatory explanation for their action.

10. If Kimble did establish that all three of the employees he mentioned were similarly situated and that all three were treated more favorably because of race or gender, which they were not, he still cannot establish that the defendants' explanations for their actions were a pretext for discrimination.

Dated this 29th day of June, 2009

      Respectfully submitted,

      J.B. VAN HOLLEN
      Attorney General


      /s/ JOHN R. SWEENEY
      Assistant Attorney General
      State Bar #1003066

      Attorneys for Defendants

Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608)-264-9457

- 13 -

Case 2:07-cv-00266-LA   Filed 06/29/09   Page 13 of 13   Document 74