UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

JOHN KIMBLE,

    Plaintiff,

v.                                              Case No. 07-C-0266

WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT,
and
J. SHEEHAN DONOGHUE
Individually,
and in her official capacity,

    Defendants.
_____

PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
_____

FINDINGS OF FACT

    1.    The Civil Rights Bureau of the Wisconsin Equal Right Division investigates and adjudicates claims arising under the Wisconsin Fair Employment Act, the Wisconsin Fair Housing Act, and the Wisconsin Public Accommodations Law.

    2.    The 1999-2001 Compensation Plan for Wisconsin employees allowed Performance Recognition Awards, Performance Recognition Payments, and Discretionary Compensation Adjustments (DCAs).

    3.    Performance Recognition Awards were wage increases, limited by a percentage of the post-award base pay in relationship to the pay range maximum for the position.

    4.    Performance Recognition Awards were to be based primarily on merit, with equity and retention as secondary factors to be considered by the agency.

1

5. Performance Recognition Payments were made in whole dollar increments between $100 and $3000.

6. Performance Recognition Payments were also to be based primarily on merit, with equity and retention as secondary factors to be considered by the agency.

7. Discretionary Compensation Adjustments were to be made "for significant and permanent changes in job duties, increased competencies, or to address pay equity or retention needs."

8. Under the compensation plan, agencies were required to develop criteria that would be used to grant DCAs prior to the award of any DCAs.

9. During discovery, plaintiff requested that the Department of Workforce Development provide all policies and procedures regarding all discretionary compensation awards or payments for the period between 1980 and 2006.

10. No policies or procedures were provided.

11. The discretionary compensation provided to Chiolino, Dixon and Taylor was provided in the form of raises in hourly rates.

12. The 1999 discretionary award to Kimble was a one-time payment.

13. During the course of the time that Kimble worked under Leanna Ware's supervision, and while J. Sheehan Donoghue was the administrator, the primary goal for Kimble and his staff was ever-increasing productivity.

14. In particular, the contract between the state Equal Rights Division and the federal Equal Employment Opportunity Commission required that the Equal Rights Division produce a certain amount of cases every month in a timely fashion.

2

15. If the Division did not meet production goals, the Division could have suffered financial consequences because, under the contract, the EEOC would have been able to reduce the contractual payments by the amount that the Division failed to meet the production goals.

16. Ware told Kimble that these were the terms of the EEOC contract long before Donoghue was the Administrator.

17. As far as Kimble is aware, the Equal Rights Division never suffered those consequences because Kimble made sure that the Division's productivity met the requirements of the EEOC contract.

18. The Milwaukee office had substantially more of the cases that met the terms of the EEOC contract than the Madison office because of higher minority populations in Milwaukee area compared to other parts of the state.

19. Kimble's productivity and the productivity of his staff were monitored monthly so that they did not have to rush to catch up with our EEOC contract requirements at the end of the year.

20. Donoghue decided to provide discretionary increases to Labor Section Chiefs Michael Dixon and James Chiolino without consulting with the Labor Standards Bureau Director, Robert Anderson, about whether an employee deserved a discretionary increase.

21. Examples of Kimble's writing do not indicate that he had such serious spelling or grammar errors in his writing that he could not be relied upon to draft "high-quality written work free of major errors in grammar, spelling or sentence structure."

22. Leanna Ware signed those evaluations without notation or change irrespective of whether the evaluations contained typographical errors.

23. Furthermore, Kimble was instructed that the Division had a policy that legislators would receive a response to their inquiries within eight hours.

24. At that time, legislators still wanted letters delivered through inter-office mail at their offices.

25. In addition, the Secretary's office had to approve any responses to legislative inquiries before the correspondence could be sent to the legislators.

26. It would have been impractical to send the letters to Milwaukee only for Kimble to send the draft response back to Madison, and in Kimble's 33 years as a Chief, such a procedure was never even suggested.

27. The one time Kimble did tried to draft a new complaint form, Kimble was required to get approval from the Madison office before he could begin using the form because Ware wanted uniform procedures, not because he had difficulty writing.

28. There were times Kimble sent policies to Ware as a rough draft, but the policies never went out under his name because they were *department* policies, and Kimble had no authority over his counterpart, Georgina Taylor.

29. Ware and Donoghue also made spelling and grammatical errors.

30. Among Kimble's accomplishments in 2002, 2003 and 2004 were "helping staff to improve over all performance in drafting clear, concise determinations."

31. Ware did not identify communications as a problem for Kimble.

32. Ware did not tell Kimble that communications with Kimble were a problem after 1994.

4

33. In all the time that Kimble was supervised by Leanna Ware, she never told Kimble that someone from the Milwaukee office had contacted her to discuss matters at the Milwaukee office.

34. Donoghue did not award Kimble a Performance Recognition Award to acknowledge and encourage his efforts to improve his management and writing skills; rather, she gave Kimble the award because she felt guilty for calling him a "stupid idiot."

35. The job duties and skills sets required for the supervisors in the Labor Standards Bureau and the Civil Rights Bureau were very similar.

36. Dixon's job performance was not "outstanding."

37. Dixon did not deserve a discretionary compensation award.

38. Kimble's job performance was, in fact, outstanding.

39. For example, Kimble's staff was approximately 40% more productive than the staff in Madison.

40. During the time that Kimble was the Chief in the Milwaukee office, the Milwaukee office never had as many staff as the Madison office.

41. At one time, Kimble had 12 staff while the Madison office had 14 or 15 Equal Rights Officers.

42. Nevertheless, the Milwaukee office routinely processed more complaints than the Madison office.

43. The Madison office was routinely behind in its production. At one point, Kimble gave up a staff position to the Madison office so that they could try to keep up with their production.

5

44. In addition, on another occasion, the Milwaukee office actually took over approximately 100 of the Madison office's oldest cases that were dual-filed with the EEOC so that the Division could keep up with our requirements for the EEOC contract and so that the Madison office could get current with its workload.

45. All this took place while Georgina Taylor was managing the Madison office.

46. Thus, it also would have taken place while Donoghue was the Administrator for the Division.

47. During the time that Kimble was the Chief of the Milwaukee office, the staff in Milwaukee was more than 50 per cent minority.

48. During that same period of time, the Madison office's staff was more than 50 percent white.

49. The State of Wisconsin's compensation plan's provisions for discretionary raises July 1, 2003-June 30, 2005 remained unchanged from the 2001-2003 plan.

50. The Defendants failed to produce criteria for discretionary raises, despite discovery requests to do so.

51. Defendants failed to provide any documentation to support the Discretionary Compensation Awards provided to Chiolino and Taylor in 2000.

CONCLUSIONS OF LAW

1. Kimble can establish a *prima facie* showing of employment discrimination under the *Mcdonnell Douglas* paradigm using indirect evidence. In order to establish indirect evidence of employment discrimination, a plaintiff must first establish the four elements of a prima facie case, as set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Those elements are: "(1) [the plaintiff] is a member of a protected class; (2) [he]

was performing [his] job satisfactorily; (3) [he] suffered an adverse employment action; and (4) similarly situated employees outside of [his] protected class were treated more favorably." *Goodwin v. Bd. of Trs. of the Univ. of Ill.*, 442 F.3d 611, 617 (7th Cir. 2006). The defendants in the case at hand have acknowledged that Kimble is a member of a protected class (African American) and that he performed his job satisfactorily. They have only challenged whether Kimble suffered an adverse employment action and whether similarly situated employees were treated more favorably than Kimble.

2.  Kimble suffered an adverse employment action when he was consistently and repeatedly denied discretionary pay increases. A denied raise is an adverse employment action. See *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1031 (7th Cir. 2003) (holding that a lower raise than comparable employees is an adverse employment action for the purpose of demonstrating a prima facie case); see also *Farrell v. Butler University,* 421 F.3d 609, 614 (7th Cir. 2005) (a denied raise is an adverse employment action). "An employer's actions which deprived the employee of compensation which [he] otherwise would have earned clearly constitute adverse employment action for purposes of Title VII." *Lewis v. City of Chicago*, 496 F.3d 645, 654 (7th Cir. 2007), citing *Bass v. Bd. of County Comm'rs, Orange County, Florida*, 256 F.3d 1095, 1118 (11th Cir. 2001). "An employer cannot discriminate against an employee and then hide behind the argument that the employee's deprivation was not material." *Lewis*, 496 F.3d at 654. Furthermore, it is the law of this case. See Document 63, decision on motion for summary judgment at 4-5.

3.  Kimble was similarly situated to Taylor, Chiolino and Dixon. An employee does not need to be identical to a plaintiff in order to be considered similarly situated. The *Peirick* court stated this, saying: "Of course, employees may be similarly situated to the plaintiff even if

7

they have not engaged in conduct identical to that of the plaintiff. The law is not this narrow; the other employees must have engaged in similar--not identical--conduct to qualify as similarly situated." *Peirick v. Ind. University-Purdue Univ. Indianapolis Ath. Dep't*, 510 F.3d 681, 689 (7th Cir. 2007). Stated another way, "a plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces. But the comparator must still be similar enough to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable: complaints about discrimination." *Filar v. Bd. of Educ.*, 526 F.3d 1054 (slip op. 17-18) (7th Cir. May 28, 2008) (internal citations omitted). Therefore in order to be a similarly situated individual, it is not necessary that a person be identical with the plaintiff. A person merely must be similar enough as to be compared for purposes of determining discrimination.

   4. The Defendants' reasons for their actions are pretextual. Kimble is able to prove the pretextual nature of the defendants' excuses. Showing pretext requires "[p]roof that the defendant's explanation is unworthy of credence." *Filar v. Bd. of Educ.*, 526 F.3d 1054 (slip op. at 23) (7th Cir. May 22, 2008), quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000). Stated another way, "Pretext is a 'lie, specifically a phony reason for some action." *Sublett v. John Wiley & Sons, Inc.,* 463 F.3d 731, 737 (7th Cir. 2006).

   5. Kimble can also use circumstantial evidence to prove a direct theory of employment discrimination. In the 7th Circuit, a plaintiff is not limited to McDonnell Douglas, and may prove his prima facie discrimination case using circumstantial evidence. "A plaintiff can … prevail under the direct method of proof by constructing a 'convincing mosaic' of circumstantial evidence that 'allows a jury to infer intentional discrimination by the

decisionmaker.'" *Rhodes v. Ill. DOT*, 359 F.3d 498, 504 (7th Cir. Ill. 2004), citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994). In order to establish employment discrimination, there need not necessarily be a "rich mosaic" of evidence; rather, "a number of weak proofs can add up to a strong proof." *Id.* at 903-904, *citing Mataya v. Kingson,* 371 F.3d 353, 358 (7th Cir. 2004) and referring to *Troupe v. May Dep't. Stores Co.,* 20 F.3d 734, 737 (7th Cir. 1994). Circumstantial evidence demonstrating intentional discrimination can be proven multiple ways, including:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination."

*Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 491 (7th Cir. Ill. 2007). "Each type of circumstantial evidence is sufficient in and of itself to support a judgment for the plaintiff; however, bits of circumstantial evidence may also be used to compose a convincing mosaic of discrimination." *Hossack v. Floor Covering Assocs. of Joliet, Inc.*, 492 F.3d 853, 862 (7th Cir. 2007).

6. The court may draw negative inferences from the lack of certain documents in the record. The *Miksis* court stated this, saying "it should be enough that there is evidence that a party would surely have introduced had it been helpful, permitting an inference that the evidence would instead have helped his opponent." *Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir. 1997) (when defendant failed to produce results of an allegedly exculpatory drug test, the court was entitled to the inference that the results would not actually have exculpated the defendant). See also *Niehus v. Liberio,* 973 F.2d 526, 530 (7th Cir. 1992) (defendant police officers' failure to

9

produce either the mug shots of the plaintiff or the allegedly broken camera that resulted in the missing mug shots gave rise to an inference that the mug shots, if produced, would have shown that the defendants had in fact battered the plaintiff), and *Doe v. Johnson*, 52 F.3d 1448, 1460-61 (7th Cir. 1995) (plaintiff's failure to produce audio tapes of her sessions with her doctor gave rise to an inference that the tapes would contradict the plaintiff's testimony).

Date:   June 29, 2009

s/ Brenda Lewison

Attorney Brenda Lewison
SBN:   1025079

Law Office of Arthur Heitzer
633 W. Wisconsin Ave., Suite 1410
Milwaukee, WI  53203-1918
(414) 273-1040 x 14
(414) 273-4859 FAX
lewisonlaw@yahoo.com