# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

JOHNNY KIMBLE

      Plaintiff,

    v.                                     Case No. 07-C-0266

WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT, and
J. SHEEHAN DONOGHUE,

      Defendants.

---

### PLAINTIFF'S POST-TRIAL BRIEF

---

## I.    PRELIMINARY STATEMENT

Johnny Kimble is an African-American male who worked for the Department of Workforce Development, Equal Rights Division[1] as supervisor of the Milwaukee office of the Civil Rights Bureau from 1976 until he retired in 2005. In that time, he occasionally received lump-sum discretionary payments, but he never received a discretionary base-building raise.

By contrast, Georgina Taylor, James Chiolino and Michael Dixon are all white or of European ancestry; Taylor is female and Chiolino and Dixon are male. All three also worked as supervisors for the Equal Rights Division (ERD). Taylor worked as supervisor in the Madison office of the Civil Rights Bureau and Chiolino and Dixon worked as supervisors in the Labor Standards Bureau. Their offices were also in Madison. All three received base-building discretionary raises, alternatively called Performance Recognition Awards or Discretionary Compensation Awards, initiated by Division Administrator J. Sheehan Donoghue.

---

[1] The Equal Rights Division was previously in the Department of Industry, Labor, and Human Relations (DILHR), until a reorganization in 1996.

In the case at bar, Kimble has claimed that he was treated differently from Taylor, Chiolino and Dixon on the basis of race and sex when the Defendants failed to provide him with any discretionary base-building raise such as was provided to these comparable (white/female) ERD supervisors.[2] Defendants originally asserted that being bypassed for a base-building raise is not an "adverse action" and therefore Kimble was not able to bring his claim, but at summary judgment, this court determined the Defendants' failure to provide such a raise was an adverse action. Doc. 63 at 4-5. Defendants also claimed that Chiolino and Dixon were not "similarly situated" to Kimble and, therefore, Kimble cannot claim that the disparate treatment constitutes discrimination. At summary judgment, this court determined that it could not find, as a matter of law, that Chiolino and Dixon were *not* similarly situated. *Id.* at 5-6.

Defendants continue to assert that Kimble did not deserve a discretionary raise either on the basis of his performance or under principles of equity. Defendants conceded with the motion to dismiss[3] at the end of the Plaintiff's case that "We go right to pretext." Tr. 290. Thus, the issues for the court do not include whether the plaintiff has made out a *prima facie* case. This brief will focus on the merits, and how the court may and should find that the Defendants illegally discriminated against Plaintiff Johnny Kimble.

## II.   PROPOSED FINDINGS OF FACT

### A.   The Department of Workforce Development

1.    The Department of Workforce Development (DWD) acts as a labor department for the State of Wisconsin and conducts a variety of work-related programs designed to connect

---

[2] While we believe that Donoghue may well have treated Kimble unequally because he is an African-American male, we are not pursuing a claim that he was passed over for any discretionary raises based on his gender alone.
[3] The transcript includes references to "Rule 52" by both parties and the court, but this writer recalls that the discussion focused on Rule 50. Plaintiff's counsel asked the court whether it wished to have post-trial briefing directed at the motion to dismiss or toward the merits. The court responded that it was academic. Tr. 332. However, under Rule 50, the court is to draw all reasonable inferences in favor of the non-moving party (see *Reeves*), while at trial, the burden of proof by a preponderance of the evidence is borne by the plaintiff. Based on the court's response, this brief examines the merits.

2

people with employment opportunities in Wisconsin. It has major responsibility for the state's employment and training services, job centers, job training and placement services provided in cooperation with private sector employers, apprenticeship programs, and employment-related services for people with disabilities. It oversees the unemployment insurance and worker's compensation programs, and is also responsible for adjudicating cases involving employment discrimination, housing discrimination, and some labor laws. Stipulation of facts ¶1.

2.      The Equal Rights Division, one of seven divisions that comprise the DWD, is at issue in this case. The Equal Rights Division, through its Bureau of Civil Rights, is charged with enforcing state laws that protect citizens from discrimination in employment, housing, and public accommodations. It also administers the enforcement of the state Family and Medical Leave Act. Stipulation of facts ¶2.

3.      The Equal Rights Division (ERD) is comprised of two bureaus: The Bureau of Civil Rights and Bureau of Labor Standards. Stipulation of facts ¶15.

4.      The Labor Standards Bureau of the Equal Rights Division enforces state labor laws relating to hours, conditions of work, minimum wage standards, and timely payment of wages. It also determines prevailing wage rates and enforces them for state and municipal public works projects not including highway projects. The Labor Standards Bureau also enforces child labor laws and the state plant closing law. Stipulation of facts ¶3.

5.      The Civil Rights Bureau of the Wisconsin Equal Rights Division investigates and adjudicates claims arising under the Wisconsin Fair Employment Act, the Wisconsin Fair Housing Act, the Wisconsin Public Accommodations Law, and the Wisconsin Family and Medical Leave Act. See Wis. Stat. §§ 111.39, 103.10, 106.52(4) and 106.52(6). Stipulation of facts ¶4.

3

B.  Discretionary Compensation Awards (DCAs)

6.     Under Wisconsin law during the period betwhaeen July 1, 1999 and May 2, 2005,[4] the compensation of state employees who were not covered by a collective bargaining agreement, such as supervisors in DWD's Equal Rights Division, was governed by successive biennial state compensation plans issued by the Wisconsin Department of Employment Relations under the authority of Wis. Stat. § 230.12. Stipulation of facts ¶9.

7.     The 1999-2001 Compensation Plan for Wisconsin employees allowed Performance Recognition Awards, Performance Recognition Payments, and Discretionary Compensation Adjustments (DCAs). Stipulation of facts ¶13.

8.     The state compensation plan for state fiscal years 1999-2001 was effective from July 1, 1999 through June 30, 2001. In Section A, General Compensation Provisions for Nonrepresented Permanent and Project Employees in the Classified Service, the plan contains provisions for Performance Recognition Awards and Performance Recognition Payments. The plan states that awards or payments under these provisions may be awarded as follows:

> Any Performance Recognition Awards granted to employes must be based primarily on merit, as determined by the appointing authority. Other recognized compensation factors (including but not limited to equity and retention) may also be considered as secondary factors in the decision to grant a Performance Recognition Award.

> Stipulation of facts ¶10.

9.     Section J of the state compensation plan for state fiscal years 1999-2001 also applied to supervisors in DWD's Equal Rights division. Part 5.00 of Section J describes Discretionary Compensation Adjustments, and states that the concept of the adjustment is to provide the appointing authority with the discretion to provide economic recognition for

---

[4] The date of Johnny Kimble's retirement.

4

significant and *permanent* changes in job duties, increased competencies, or to address pay equity or retention needs. Stipulation of facts ¶11 (emphasis added).

10. The state compensation plan for state fiscal years 2001-2003 was effective from July 1, 2001 through June 30, 2003. In Section A, General Compensation Provisions for Nonrepresented Permanent and Project Employees in the Classified Service, the plan contains a provision which states that Discretionary Compensation Adjustments and Discretionary Compensation Performance Recognition Adjustments shall be granted in accordance with Section J of the plan. Stipulation of facts ¶12.

11. Part 2.00 of Section J of the state compensation plan for state fiscal years 2001-2003 describes Discretionary Compensation Adjustments and states that the concept of the adjustment is to allow the appointing authority the discretion to provide economic recognition to employees for significant and *permanent* changes in job duties, increased competencies, or to address pay equity or retention needs. Parts 3.00 and 4.00 of Section J describe the Discretionary Compensation Performance Recognition Adjustment and the Discretionary Compensation Performance Recognition Payment. For each of these, the concept is described as allowing the appointing authority the discretion to provide economic recognition to an employee for meritorious performance. Stipulation of facts ¶14 (emphasis added).

12. Part 2.00 of Section J of the state compensation plan for state fiscal years 2003-2005 describes Discretionary Compensation Adjustments and states that the concept of the adjustment is to allow the appointing authority the discretion to provide economic recognition to employees for significant and *permanent* changes in job duties, increased competencies, or to address pay equity or retention needs. No mention is made of "Performance Recognition

5

Adjustments" or "Performance Recognition Payments" in the 2003-2005 plan. Ex. 7 (emphasis added).

13.     In short, the State Compensation Plans had different names in different years for essentially the same concepts: that non-represented employees could be provided discretionary payments or wage increases (PRAs, PRPs, DCAs, DCPRAs, DCPRPs) based on merit, equity, retention, or other factors. See Exs. 33, 34 and 7. Throughout this case, the various payments are sometimes referred to by their formal names (e.g. "Performance Recognition Payments") or, in the alternative, by more general language encompassing all of the possible mechanisms for the raises with such terms as discretionary payments, discretionary raises, discretionary awards or even just "DCAs."

C.  DCA Criteria

14.     The Compensation Plan for 1999-2001 required the development of criteria consistent with the plan as follows:

> Initial applicability.  Agencies must develop criteria that will be used to grant DCAs prior to award of any DCAs.  The criteria must be developed and applied in a non-discriminatory manner.  As necessary, the Secretary of DER may require approval of agency criteria prior to the granting of any DCAs.
>
> Ex. 33, p. 22.

15.     Similarly, the Compensation Plan for 2001-2003 required standardized procedures relating to the grant of DCAs as follows:

> Initial Applicability.  Agencies must develop administrative procedures that will be used to grant DCAs prior to awarding DCAs.  The administrative procedures must be developed in accordance with the guidelines issued by the DER Secretary and will be applied in a uniform manner throughout the agency or employing unit.
>
> Ex. 34, p. 12.

6

16.     DWD failed to comply with the requirements of the 1999-2001 compensation plan in that it failed to develop criteria for granting DCAs.  Tr. 314-5.

17.     Despite the agency's failure to comply with the requirements of the 1999-2001 compensation plan, J. Sheehan Donoghue granted at least three discretionary compensation awards during that period.  Tr. 314-5.

D.     J. Sheehan Donoghue

18.     Defendant J. Sheehan Donoghue was the Administrator of the Wisconsin Department of Workforce Development ("DWD") Equal Rights Divison from 1991 to January 6, 2003, the date of her retirement.  Stipulation of facts ¶5.  Donoghue is a white female.

19.     As Administrator of the Equal Rights Division (ERD), Donoghue was the direct supervisor of the two Bureau directors.  Donoghue was responsible for monitoring performance and production issues, as well as all personnel problems within the ERD.  Stipulation of facts ¶20.

E.     Leanna Ware

20.     LeAnna Ware is employed by the DWD as the Civil Rights Bureau Director, and she has held that position since February 1992.  Stipulation of facts ¶16.  Ware is a white female.

21.     In her capacity as Bureau Director, Ware oversaw the Hearing and Mediation Section, the Milwaukee Civil Rights Office, and the Madison and Upstate Civil Rights Offices. As such, Ware was Johnny Kimble's direct supervisor from February 1992 until his retirement on May 2, 2005.  Stipulation of facts ¶17.

22.     During the time that Sheehan Donoghue was the Administrator of the Equal Rights Division, Ware never recommended anyone for a Discretionary Compensation Award (DCA), nor did she recommend anyone for a Discretionary Compensation Award for the period

7

between Donoghue's retirement in January 2003 and Johnny Kimble's retirement in May 2005. Stipulation of facts ¶19.

23.     Ware understood that the Equal Rights Division had very limited funds available for such awards and, therefore, only persons who had made extraordinary contributions above and beyond their position descriptions or had very outstanding performance in all aspects of their positions were considered for such awards.  Ex. 28, ¶7; Tr. 130-1.  She gained this understanding through her conversations with Donoghue.  Tr. 132.   She did not believe that Taylor met this standard.  *Id.*

24.     Ware was not aware that Donoghue granted Taylor an "equity" award in 2000. Tr. 133.

25.     Ware noted that she, herself, had never been given a discretionary compensation award even though her performance had been highly praised.  Tr. 132.  However, Ware later admitted that she had actually received one such award.  Tr. 150.

F.     <u>Robert Anderson</u>

26.     Robert Anderson is employed by the DWD as the Labor Standards Bureau Director.  Tr. 195.  As such, Anderson was the direct supervisor for the Sections Chiefs of the Construction Wage Standard section and the Labor Standards section.  Tr. 196.  Thus, he was the supervisor for James Chiolino from the time Chiolino became the section chief of the Labor Standards Compliance section in late 1999 through the early fall of 2006.  *Id.*  Anderson was also the supervisor for Michael Dixon from the time Dixon became the section chief of the Construction Wage Standard section in the fall of 2001 through the spring of 2007.  *Id.*  Robert Anderson is a white male.

8

F.  Howard Bernstein

27.  Howard Bernstein is employed by DWD in the position of Chief Legal Counsel and has held this position since the Department was created on July 1, 1996. Stipulation of facts ¶6.

G.  Johnny Kimble

28.  Johnny Kimble is an African-American male. Stipulation of facts ¶7.

29.  Kimble began his employment with the State of Wisconsin in 1972. Ex. 10, p. 1.

30.  At all times material, Kimble was employed by the Bureau of Civil Rights, Milwaukee Equal Rights Office. Civil Rights Bureau Director LeAnna Ware was Kimble's immediate supervisor from February 1992 forward; Defendant J. Sheehan Donoghue was the DWD Equal Rights Division Administrator from 1991 until Donoghue retired in January 2003. Stipulation of facts ¶8.

31.  From 1979 to his retirement in May 2005, Johnny Kimble was employed by DWD as the supervisor of the Milwaukee Civil Rights Bureau. Stipulation of facts ¶18. Immediately prior to reclassification in 1979, Kimble was classified as a "lead worker" for three years with essentially the same responsibilities. Tr. 233-4, Ex. 10.

32.  By the time of his retirement, Kimble supervised seven clericals and thirteen investigators for a total of twenty employees; depending on the timeframe, the number of clericals he supervised was between five and seven and the number of investigators was between eleven and thirteen. Tr. 269.

33.  After ERD Deputy Administrator Frank Humphrey left the Department in approximately 1992 or 1993, Kimble was the only Black management employee. Tr. 26, 247.

9

34.     Kimble described his supervisory responsibilities this way:

Well, my most important responsibility was to make sure that we met our EEOC contract obligation.  The majority of the cases that were submitted to the EEOC came in our office.  Another function was training staff and to make sure that the production and quality of work that came out of our office met the standards for the law.

Another extremely important function was the intake of complaints to make sure that we assisted the people who came into our office.  We had a functional illiteracy problem in that area which required us to spend considerably more time.

Tr. 234.

35.     Johnny Kimble never received a discretionary compensation award or any other discretionary wage increase which raised his base pay.  Stipulation of facts ¶29.

36.     At the beginning of Donoghue's tenure, there were routine meetings for DWD management which included Donoghue, Kimble, Ware, Anderson and Donoghue's executive assistant, Lynn Hendrickson.  Tr. 237-8.

37.     Initially, Kimble was an enthusiastic participant at the meetings.  Tr. 240.  Later, he stopped actively participating because Donoghue's body language was such that she exhibited impatience or else it seemed that she was only listening so that she could formulate her response; more than once it seemed that unless someone else corroborated what he said, what he had to say was not heard or believed.  Tr. 240-3.

38.     For example, when Kimble complained that the Milwaukee office had difficulty getting technical support help, Donoghue did not believe him, but when Jim Chiolino spoke up and confirmed that it could take up to two weeks for them to get a response to a request for technical support, Donoghue believed Chiolino.  Tr. 242-243.

10

39.     In June 1999, Donoghue awarded Kimble a discretionary payment characterized as a "Performance Recognition Award" for $300.00 as a single payment.  Stipulation of facts ¶21; Ex. 24.

40.     According to the June 30, 1999, letter informing Kimble of the award, such awards are given "as a way to acknowledge, recognize and encourage outstanding and meritorious service" and Donoghue provided Kimble with this particular award to acknowledge and encourage his efforts to improve his management and writing skills.  Ex. 23, ¶6; Ex. 24.

41.     This was the only performance award Kimble received while Donoghue was the Administrator.  Tr. 254.

42.     By contrast, Kimble received five performance awards between 1981 and 1989. Tr. 254; Ex. 45.  He received a one-time cash award for each of them.  Tr. 257.

43.     In addition, during his career, Kimble received various certificates of achievement from the Department of Workforce Development and the State of Wisconsin.  Ex. 46.

44.     He also received two awards from the Wisconsin Association of Black Public Sector Employees for his service, two awards from the Wisconsin Fair Housing Network for outstanding commitment and service, and a recognition award from City of Milwaukee introduced by Alderman Bob Bauman.  Tr. 258-9; Ex. 47.

45.     Kimble's office was generally more productive than the Madison office was during the time that Georgina Taylor was his counterpart in Madison.  Tr. 252, 254.

46.     Donoghue testified that she discussed the 1999 award to Kimble with Leanna Ware and Department Secretary Linda Stewart prior to issuing the award.  Tr. 39.

47.     By contrast, Leanna Ware testified that she did not recall any communication about the 1999 award to Kimble prior to the award.  Tr. 105.

11

48.     Donoghue claimed that after the June 1999 award Kimble's performance "slipped markedly." Ex. 23, ¶19.

49.     Donoghue testified that she had a reservation about Kimble's limited skills in writing or proofreading as it affected the initial determinations.  Tr. 21.

50.     Donoghue claimed that it was Kimble's duty to review "every initial determination that was drafted before it was issued with the exception of certain people who had unusually good analytical or writing skills."  Tr. 17.

51.     Donoghue testified that she received this information from Leanna Ware (Tr. 17), but Leanna Ware testified that she did not expect the Bureau Chiefs to do more than spot check the investigators' initial determinations unless the investigator was new or had an identified performance problem.  Tr. 128.

52.     Contrary to Donoghue's claim that Kimble's performance "slipped markedly" after 1999, Kimble's annual evaluations, which were written by Leanna Ware and approved by Donoghue (Tr. 18), show that his performance *improved* after the June 1999 award.  Specifically, on August 1, 1999, Ware and Donoghue noted that he made progress "improving his own writing skills and proof reading."  Ex. 30.  On August 17, 2000, Ware and Donoghue again noted that Kimble had made progress "improving his own writing skills and proof reading."  *Id.*  There are no evaluations, or any other documents presented in this case which corroborate that either Donoghue or Ware believed that Kimble's writing skills or other performance deteriorated at all after the June 1999 award.

53.     The only samples of Kimble's writing presented as evidence in this case were documents which had been reviewed by Ware while Kimble still worked at the DWD and Ware

12

testified those documents did not indicate that there were any problems with his writing. Exs. 3a, 3b, 4a, 4b, 5; Tr. 152-3.

54.    Donoghue testified that there were certain objective criteria used to evaluate Bureau Chiefs. Specifically, the Department reviewed the time it took to process complaints at the intake stage, and Kimble had better numbers in that regard than the Madison office under Georgina Taylor. Tr. 66-7. The Department also monitored how long investigations took to completion and, again, Kimble had better numbers than the Madison office under Georgina Taylor. Tr. 58. Between 1999 and 2000, Ware noted in Kimble's evaluation that his office reduced the average days for investigation of cases in the section from 159 to 138; between 2000 and 2001, the average days for investigation of cases went from 139 to 113 days; between 2001 and 2002, the average was only 112 days ("a new low!"). Ex. 30.

55.    After reviewing Kimble's evaluations, Ware testified that she was unaware of anything that was consistent with a description of Kimble's performance as having "slipped markedly." Tr. 123.

56.    Kimble believes that he may have received the June 30, 1999, award because shortly before he received the award, Donoghue had called him a "stupid idiot," after she learned that she had berated him about old, stale cases which were not actually his responsibility. Tr. 259-60. Ware was present at the time. Tr. 261.

57.    Donoghue has denied calling Kimble a "stupid idiot," (Ex. 35), but she has also denied yelling at her staff. Tr. 46-7.

58.    However, Ware stated that Donoghue had a reputation for raising her voice at her staff. Tr. 108. Anderson also testified that Donoghue would raise her voice at staff. Tr. 207. Kimble heard Donoghue yell at someone himself. Tr. 262. Pamela Rasche testified that

Donoghue had a reputation for raising her voice and that at a management meeting Donoghue herself acknowledged that Donoghue was sometimes intemperate. Tr. 162.

59.     By the second day of trial, Donoghue acknowledged that she had a "strong speaking voice" and that sometimes she would yell *to* (not at) her assistant to come into Donoghue's office instead of using the intercom; she also acknowledged that sometimes she raises her voice when she is unhappy. Nevertheless, she continued to deny that she shouted at staff. Tr. 309.

60.     Kimble testified that Leanna Ware was present and directly involved in this discussion when Donoghue called Kimble a "stupid idiot." Although it would have been in the Defendant's best interest to call Ware if Ware would have disputed this claim, the Defendants did not call her to rebut Kimble's testimony.

61.     Shortly before the trial, Ware contacted Pamela Rasche and told Rasche that she (Ware) thought that there were three reasons why Kimble did not deserve a discretionary raise: 1) he was not a good supervisor; 2) he had poor writing skills and 3) he had a volatile temper. Tr. 160-1. Ware also told Rasche that she (Rasche) was on the plaintiff's witness list; Rasche had not known she was on the witness list up until that point. *Id.* Ware specifically brought up a situation with a Betty Martin in her conversation with Rasche, suggesting that there might be some evidence that Kimble had a volatile temper. Tr. 172.

62.     At trial, Ware denied that she gave anyone a list of three things that she felt made Kimble ineligible for a discretionary award. Tr. 140. She testified that Kimble was passionate about civil rights, and denied that he had a temper that was a major problem related to his employment. Tr. 142. She denied that she would have said that Kimble was not a good

14

supervisor. Tr. 141. She further testified that she would not agree with a statement that Kimble was not a good supervisor. Tr. 146.

63. Donoghue claimed that the reason she did not give Kimble a discretionary award based on equity was that "he was just one notch below the top of what he could receive at that point in time. I felt he did not merit an equity award. There were people who were receiving less than he was receiving." Tr. 304.

64. In fact, by 2002, of the four supervisors at issue, only Georgina Taylor was receiving less per hour than Kimble was receiving, even though Taylor and Kimble had many more years in state service and much more experience as supervisors than did Chiolino and Dixon. Exs. 9, 10, 13 and 22.

H. Comparables

65. Kimble has identified three individuals who held positions comparable to his own: James Chiolino, Michael Dixon and Georgina Taylor. Stipulation of facts ¶22.

66. The formal civil service classification of Kimble, Chiolino, Dixon, and Taylor was the same: Equal Rights Supervisor. Chiolino and Dixon were section chiefs in the Bureau of Labor Standards. Kimble and Georgina Taylor were section chiefs in the Civil Rights Bureau. Stipulation of facts ¶23.

67. As early as 1990, the section chiefs were considered comparables. Ex. 2.

I. Georgina Taylor

68. Georgina Taylor began her employment as an Equal Rights Supervisor on May 13, 1996, as the Madison/Field Investigation Section Chief, and held that position for the duration of Donoghue's tenure as the ERD Administrator until Donoghue's retirement on January 6, 2003. Stipulation of facts ¶26.

15

69.     Georgina Taylor was a supervisor in the Department of Workforce Development, Equal Rights Division, Civil Rights Bureau for the period from her transfer in 1996 through May 2005.  Stipulation of facts ¶41.  Taylor supervised 11-13 employees, depending on time and vacancies.  Tr. 179.

70.     From the time Georgina Taylor became a supervisor in the DWD Equal Rights Division in 1996, through May, 2005, Taylor's immediate supervisor was DWD Civil Rights Bureau Director LeAnna Ware.  Stipulation of facts ¶42.

71.     LeAnna Ware did not recommend that Georgina Taylor receive a discretionary compensation award in 2000.  Stipulation of facts ¶43.

72.     J. Sheehan Donoghue did not ask LeAnna Ware whether Ware believed that Taylor had earned or deserved a discretionary compensation award in 2000.  Stipulation of facts ¶44.

73.     Taylor began her employment with the State of Wisconsin in 1974. Ex. 22, p. 1.

74.     Taylor's national origin is Argentine.  Stipulation of facts ¶45.

75.     Taylor is a second-generation Argentine; her parents were born in Argentina, and her grandparents were born in Spain.  Tr. 178.

76.     Georgina Taylor received equity awards in 1984 and 1987, as reflected in her payroll records.  Ex. 22, p. 2.  Her payroll records indicate that she received a "Discretionary Comp Awd" effective April 23, 2000.  *Id.,* p. 3.  This raised her rate of pay to $23.234 per hour. *Id.*

77.     Taylor testified that she received an attachment with her paycheck when she received the pay increase; the attachment indicated the raise was based on equity.  Tr. 174-5.

16

78.     Donoghue recalls that she granted Taylor the raise of 50 cents per hour in 2000[5] based on equitable considerations.  Ex. 23, ¶18.  Specifically, Donoghue recalled that she granted the raise to Taylor "to bring her pay range more closely in line with the other supervisors within the Equal Rights Division" and that "She still continued to remain the lowest paid supervisor in the division."  Tr. 295.

79.      Prior to trial, Donoghue specifically denied that she granted Taylor a "discretionary compensation award."  Ex. 23, ¶18.  At trial, however, Donoghue testified that she gave Taylor a "discretionary performance award" based on equity due to the suggestion by the "Personnel Section or Bureau of the Division of Administration in the Department of Workforce Development" that a raise based on equity would be appropriate for Taylor.  Tr. 295.

80.     There is no corroborating or other documentation related to Taylor's April 23, 2000, "equity" raise other than her payroll records.  See Ex. 22.

81.     Ware was unaware that Taylor received an equity award in 2000.  Tr. 133.

    J.   James Chiolino

82.     James Chiolino is male and white, or "Caucasian."  Stipulation of facts ¶40.

83.     James  Chiolino began his employment with the State of Wisconsin in 1987.

84.     James Chiolino was promoted to Equal Rights Supervisor effective May 9, 1999, and remained the section chief of the Labor Standards Compliance Section for the remainder of the time Donoghue was the administrator of the ERD.  Chiolino's section in Labor Standards handled general labor standards cases, minimum wage, overtime, child labor, failure to pay

---

[5] At trial, Donoghue testified that she granted the award to Taylor in 1999.  Tr. 295.  However, on cross-examination she admitted that "My attorney could have misstated the time, and I probably just went along and said it was 1999."  Tr.  317.

wages due, plant closing laws and other related labor standards laws. Stipulation of facts ¶24; Ex. 9, p. 2.

85.      Chiolino transferred from his position as the Labor Standards Compliance Section Chief to a position as the Civil Rights Bureau Section Chief for the Madison and upstate compliance section for civil rights in the early fall of 2006. Tr. 195-6.

86.      From James Chiolino's promotion to a supervisor in 1999 through May 2005 Chiolino's immediate supervisor was DWD Labor Standards Bureau Director Robert Anderson. Stipulation of facts ¶37.

87.      During his tenure as a supervisor in the Labor Standards Bureau, Chiolino was responsible for supervising a total of twelve employees. Tr. 206.

88.      When Chiolino was promoted, his pay went from $18.795 per hour to $20.571 per hour; after six months in the supervisory position, his pay increased again, to $21.587 per hour. Ex. 9.

89.      In 1999, Donoghue believed that "The purpose of an equity award was just as the word equity implies. It is to make that person receiving the award more equal in the pay range and salary received that that individual would have in relation to others situated in the same definition, for instance, as a supervisor." Tr. 293.

90.      Donoghue granted Chiolino a Discretionary Compensation Award effective April 23, 2000 in the amount $2.00 per hour, less than a year after his promotion to a supervisory position and, thus, before his one-year probationary period was completed. Ex. 9, p. 2; Tr. 85. The $2.00 per hour raise increased his hourly rate to $23.587 per hour. *Id.* According to Donoghue, she provided the increase to Chiolino based on equity. Ex. 23, ¶11.

18

91.     There is no documentation of Chiolino's April 23, 2000, "equity" raise other than his payroll records.  See Ex. 9.  Furthermore, there are no annual or probationary reviews for his performance between May 9, 1999, and April 23, 2000, which could support the conclusion that he was due a raise based either on equity or merit.

92.     Prior to trial, Donoghue stated that she granted Chiolino an "equity" increase in 2000 based on Chiolino's "ongoing exemplary job performance."  Ex. 23, ¶11.  This is inconsistent with her trial testimony, since by trial she claimed that the purpose of an equity increase was to make someone "more equal" with employees in the same job category.  Tr. 293. There were also conflicts within her testimony as to her reasons for providing the 2000 raise to Chiolino in that she initially testified that she provided the award because his performance was "outstanding" and because she wanted to "bring him up to a better level within the supervisory pay scale within the division" (Tr. 83), she then testified that she provided the 2000 raise based solely on equity, but then she changed her testimony again to indicate that the 2000 raise was based on both equity and performance.  Tr. 296-7.

93.     Instead of making Chiolino "more equal" to the other supervisors, Chiolino earned 35 cents per hour more than Taylor after his so-called equity increase.  His $2.00 per hour raise allowed him to leapfrog ahead of Georgina Taylor, who had 15 years more experience with the State of Wisconsin and 19 more years of experience as a supervisor with the State and the DWD.  Compare Ex. 8, pp. 1-2 and Ex. 22, pp. 1-3.  Thus, the attempt to make Taylor "more equal" by providing her with an equity increase was undermined by providing Chiolino with a so-called equity increase.

94.     Furthermore, Chiolino's April 2000 equity increase put him only 49.6 cents per hour behind Johnny Kimble, who had 15 more years of service with the State of Wisconsin than

19

Chiolino, and 23 more years of experience as an Equal Rights Supervisor than Chiolino.

Compare Ex. 9, pp. 1-2 and Ex. 10, pp. 1-3.

95.     Effective May 20, 2001, Donoghue granted Chiolino a Performance Recognition Award of $1.00 per hour, this time for his "outstanding" performance.  Tr. 298-9; Ex. 40.  The raise put Chiolino's hourly rate at $25.466 while Kimble's hourly rate was $25.125.  Exs. 9, 10.  Donoghue testified that "For performance awards it was my understanding in 1999 that individuals had to have outstanding performance; do their job extremely well and go above and beyond in my opinion, as the award -- the person making the award, in the performance of their job."  Tr. 294.

96.     By 2001 the Department had come up with specific standards for grants of Performance Recognition Awards, as follows:

> The Performance Recognition Award is a means by which the department can acknowledge and encourage outstanding and meritorious service of dedicated non-represented employees.  Awards may be granted in the form of base building or lump sum awards.  Base building awards are intended to address or recognize sustained exemplary performance or unusually difficult or sensitive work that results in a major contribution to meeting the mission of the department.  Lump sum awards are intended to address or recognize an exceptional work load resulting in many uncompensated work hours, outstanding performance on a one time special project or performance on an acting or temporary assignment.

Ex. 40.

97.     Donoghue's written rationale for providing Chiolino with a Performance Recognition Award was consistent with the criteria for a lump sum award, not a base-building raise, as it was primarily based on Chiolino's handling of personnel issues which should have been one-time special projects which would be completed either with improvement in the performance of the employee(s) in question or with an employee's discharge.  See Ex. 40.

20

98.     Donoghue's testimony confirms that her primary reason for providing Chiolino with a raise in 2001 was based on his handling of personnel matters, regardless of whether he broke the law while doing it.  Tr. 78-83.

99.     At least in 2001, there is some documentation of Chiolino's performance.  His supervisor, Robert Anderson, also believed that Chiolino's performance that year was outstanding, although the performance review which outlines the bases for this conclusion was apparently written *after* Donoghue provided Chiolino with the $1.00 per hour increase in 2001. Compare Ex. 40 (dated 5/16/01) and Ex. 41 (evaluation dated 6/20/01).

100.    Donoghue never mentioned the raises she provided Chiolino to Chiolino's supervisor, Robert Anderson; he did not learn about either of them until after the instant lawsuit was filed, sometime in 2008.  Tr. 214, 221.

101.    In Anderson's opinion, the raise provided to Chiolino in 2000 was premature.  Tr. 221.  This seems logical, as the raise was provided to Chiolino before the end of Chiolino's probationary period and, thus, arguably before a determination had been made that Chiolino would continue in his role as a supervisor.  If the 2000 "equity"-based raise was designed to make his salary comparable to other supervisors, it would have made sense to wait until his probationary period was done to see if he was going to continue as a supervisor.

102.    Robert Anderson did not recommend that James Chiolino receive a discretionary compensation award in 2000.  Stipulation of facts ¶38.

103.    Donoghue was aware that Chiolino's 2001 raise allowed him to leapfrog ahead of Kimble, even though Kimble had more experience as a supervisor and more tenure in state service.  Tr. 318.  Donoghue was not concerned about any inequity this caused for Kimble.  *Id.*

104.    Robert Anderson did not recommend that James Chiolino receive a performance recognition award in 2001.  Stipulation of facts ¶39.

   K.   Michael Dixon

105.    Michael Dixon is male and white or "Caucasian."  Stipulation of facts ¶35.

106.    Michael Dixon was promoted to the Equal Rights Supervisor position in the Labor Standards Bureau effective November 11, 2001, and remained section chief of the Construction Wage Rate Section for the duration of Donoghue's tenure as Equal Rights Division Administrator.  The Construction Wage Rate Section specialized in setting the prevailing wage rates on public construction projects and investigated complaints alleging that the prevailing wage rate was not being paid on public projects in particular areas around the state.  They conducted informational programs for employers and employees throughout the state. Stipulation of facts ¶25; Ex. 13, p. 1.

107.    Michael Dixon was a supervisor in the Department of Workforce Development, Equal Rights Division, Labor Standards Bureau, for the period from his promotion in 2001 through at least the time of Johnny Kimble's retirement.  Stipulation of facts ¶30.

108.    After Michael Dixon's promotion to supervisor in 2001 and through May 2005, Dixon's immediate supervisor was DWD Labor Standards Bureau Director Robert Anderson. Stipulation of facts ¶31.

109.    When Dixon was promoted to a position as a supervisor, he received a raise of $4.00 per hour so that, effective November 11, 2001, he earned $25.125 per hour, the same rate that Johnny Kimble was receiving at the time, even though Kimble had 25 years of experience as a supervisor by 2001.  Compare Ex. 13, p. 1-2 and Ex. 10, pp. 2-3.

22

110.    Effective June 2002, both Dixon and Kimble received regular pay plan increases, which put their wages at $25.628 per hour.  *Id.*

111.    Dixon remained in his position as an Equal Rights Supervisor (also known as a Section Chief) until his retirement in 2007.  Ex. 13, p. 2.

112.    On September 23, 2002, Donoghue nominated Dixon for a $1.00 per hour raise as a Performance Recognition Award, effective October 6, 2002.  Ex. 14; Ex. 13, p. 2.  If Donoghue's testimony is believed, even before this raise, Dixon must have been at or near the top of the pay range, since he and Kimble had the same pay rate prior to the October 2002 award to Dixon, and Donoghue claimed she would not give Kimble a discretionary raise based on equity because he was "just one notch below the top of what he could receive at that point in time."  Tr. 304.  No similar raise was given to Kimble.

113.    Prior to trial, Donoghue claimed that Dixon deserved the raise because he had shown "excellent performance" and that she "had concerns that he would leave the Department for a position that paid more" and, thus, the raise was intended to reward Dixon for his performance and ensure his retention.  Ex. 23, ¶13.

114.    At trial, Donoghue testified that the 2002 award to Dixon was really for retention.  Tr. 84-5.

115.    Donoghue's nomination for Dixon's 2002 discretionary raise indentifies "meritorious performance" as the reason for his discretionary raise; retention is not mentioned as part of the rationale, even though retention is clearly identified on the State's form as a potential reason to provide a discretionary raise.  Ex. 14.  No other document or corroboration was presented to support the existence of this "retention" rationale in any way.

116.	Robert Anderson did not recommend that Michael Dixon receive a performance recognition award in 2002.  Stipulation of facts ¶32.  Anderson did not learn that Dixon had received a discretionary raise until sometime in 2003.  Tr. 198.

117.	J. Sheehan Donoghue did not ask Robert Anderson whether he believed Michael Dixon earned or deserved a performance recognition award in 2002.  Stipulation of facts ¶33; Tr. 84.

118.	Had Donoghue asked Anderson whether Dixon deserved a performance recognition award for either meritorious performance, Anderson probably would have told Donoghue that Dixon did not deserve such as an award, as Dixon did not meet the criteria identified by 2002 as the bases for an award for meritorious performance.  See Exs. 41 and 14; Tr. 203.

119.	Indeed, in Dixon's first year as a supervisor, Anderson told Donoghue that Dixon's performance was only average, although by the time of Dixon's probationary period reviews, Anderson rated Dixon "above average."  Tr. 204; Ex. 17.

120.	Dixon's performance went down from there.  Tr. 204.

121.	As for Donoghue's concerns about retention, Dixon did not mention to Anderson that Dixon was considering retiring during Dixon's first year of employment as a supervisor.  Tr. 205.

122.	Furthermore, Anderson would not have been sorry to see Dixon go, since Dixon was reluctant to actually supervise his employees, even though he was only responsible for two or three employees.  Tr. 205.

123.	Anderson provided Dixon with Dixon's best evaluation during Dixon's first year of employment as a supervisor.  Tr. 203.

24

124.    By the time Dixon had been a supervisor three years, Anderson described Dixon's performance as "marginally satisfactory."  Ex. 17 (evaluation dated 5/28/04).

125.    As with Chiolino, Donoghue provided Dixon with his "performance recognition award" before Dixon even completed his probationary period of one year.  Tr. 84-85; see also Ex. 13.  In Dixon's case, he received his raise approximately 11 months after he began his supervisor position.  Ex. 13.

126.    Donoghue was aware that Dixon's 2002 raise allowed him to leapfrog ahead of Kimble, even though Kimble had more experience as a supervisor and more tenure in state service; Donoghue was not concerned about equity as it related to her decisions regarding Dixon's raise in comparison to Kimble's pay rate.  Tr. 318.

127.    Robert Anderson did not believe Michael Dixon had earned or deserved a performance recognition award in 2002.  Stipulation of facts ¶34.

L.    Lynn Hendrickson

128.    Lynn Hendrickson was Donoghue's executive assistant and supervisor of program support and only has a high school diploma.  Tr. 25, 95.  By 2002, she was making almost as much as Kimble.  Tr. 166.  She received two or three discretionary raises from Donoghue.  Tr. 29.

129.    Hendrickson is female and white, or Caucasian.  Tr. 320.

ARGUMENT

I.    INTRODUCTION

The Seventh Circuit has stated as follows:  "During and after any Title VII trial, the sole

legal issue is whether the plaintiff presented sufficient evidence to permit a rational jury to

determine that she was the victim of intentional discrimination."  *Hossack v. Floor Covering*

*Associates of Joliet,* 492 F.3d 853, 861 (7th Cir. 2007).  The evidence presented may be direct or

circumstantial.  *Id.*  Indeed, "'Circumstantial evidence is not only sufficient, but may also be

more certain, satisfying and persuasive than direct evidence.'" *Desert Palace, Inc., v. Costa,* 539

U.S. 90, 100 (2003) citing *Rogers v. Missouri Pacific R. Co.,* 352 U. S. 500, 508, n. 17 (1957).

Circumstantial evidence "allows a jury to infer intentional discrimination by the

decisionmaker" from suspicious words or actions.  *Hossack* at 862.  The Seventh Circuit has

identified three types of circumstantial evidence, as follows:

> The first [and most common] consists of suspicious timing, ambiguous statements
> oral or written, behavior toward or comments directed at other employees in the
> protected group, and other bits and pieces from which an inference of
> discriminatory intent might be drawn. . . . Second is evidence, whether or not
> rigorously statistical, that employees similarly situated to the plaintiff other than
> in the characteristic (pregnancy, sex, race, or whatever) on which an employer is
> forbidden to base a difference in treatment received systematically better
> treatment. And third is evidence that the plaintiff was qualified for the job in
> question but passed over in favor of (or replaced by) a person not having the
> forbidden characteristic and that the employer's stated reason for the difference in
> treatment is unworthy of belief, a mere pretext for discrimination.
>
> Each type of circumstantial evidence is sufficient in and of itself to support a
> judgment for the plaintiff; however, bits of circumstantial evidence may also be
> used to compose a convincing mosaic of discrimination.
>
> *Id.*  citing *Troupe v. May Dept. Stores,* 20 F.3d 734, 736 (7th Cir.1994) (citations
> omitted).

26

The third example given above looks suspiciously like the method of proof used under the McDonnell-Douglas paradigm, although the principles originally espoused in *Troupe v. May Dept. Stores* are more frequently referred to as the "mosaic" method of proving discrimination. See *Hasan v. Foley & Lardner LLP,* 552 F.3d 520 (7th Cir. 2008). Nevertheless, it is worth remembering that McDonnell-Douglas examined the role of circumstantial evidence in discrimination cases, not what constituted "direct" circumstantial evidence as opposed to "indirect" circumstantial evidence. See *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973).

Notwithstanding the articulations by the Seventh Circuit regarding the methods by which a plaintiff can prove discrimination, the U.S. Supreme Court has twice stated that the court need not go so far as to look at anything other than the plaintiff's prima facie case and the proof of pretext in order to find that the defendant has engaged in illegal discrimination. The Court's most recent iteration came in *Reeves v. Sanderson Plumbing Products,* 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). *Reeves* quoted *St. Mary's Honor v. Hicks,* 509 U.S. 502 (1993) at length, as follows:

> **"The court's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination.** Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional discrimination." Id., at 511.

*Reeves*, at 530 U.S. at 148 (emphasis added).

The *Reeves* court went on to state:

> Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. See id., at 517 ("[P]roving the employer's reason false becomes part of (and often considerably assists) the greater enterprise of proving that the real reason was intentional discrimination").

*Id.*

The Reeves court explained its reasoning as follows:

Moreover, once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). **Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.**

*Id.* (Emphasis added).

In the case at bar, the Defendants have conceded that Plaintiff Kimble has made out a prima facie case of discrimination, and thus "We go directly to pretext." Tr. at 290.

Not so fast. The Plaintiff will emphasize evidence in addition to its proof of pretext to show that the Defendants engaged in illegal discrimination. For example, evidence that non-African-Americans similarly situated to Kimble (Taylor, Chiolino, Dixon, and even Hendrickson) were consistently treated better than Kimble is evidence that the Defendants engaged in illegal discrimination. Donoghue's incredible testimony regarding her explanations for providing raises to Taylor, Chiolino and Dixon should be considered with the unsupported and contradicted claims regarding Kimble's performance.

Plaintiff will also emphasize other bits and pieces of evidence which show a picture, or "mosaic," of illegal discrimination.

Defendants have claimed that the reason Kimble was not provided with any discretionary raise was because his performance was not "outstanding." Ex. 23, ¶19. Donoghue led Ware to believe that "only persons who had made extraordinary contributions above and beyond their

28

position descriptions or had very outstanding performance in all aspects of their positions were considered for such awards." Ex. 28 ¶7; Tr. 132. These were not actually the standards for providing discretionary raises. Exs. 11, 14. Donoghue also testified that she was not concerned about whether there were any inequities vis-à-vis Kimble which would have been a reason to provide him with a discretionary raise when she gave raises to Chiolino and Dixon. Tr. 318-9.

The evidence shows that if Donoghue had applied the same standards to Kimble as she did to others, Kimble would have received a discretionary raise. Conversely, if she had applied the same standard to the comparators as she did to Kimble, she should not have given them the raises that she did.

Ultimately, this brief will focus on the evidence from which the court can and reasonably should conclude that the reasons offered by the Defendant for failing to provide Kimble with any discretionary raise are unworthy of credence. Given that, and the demonstrated mendacity of the Defendants, the court can and should conclude that the Defendants have instead engaged in illegal discrimination against him.

II.    THE DEFENDANTS PROFFERED REASONS FOR PROVIDING TAYLOR, CHIOLINO, AND DIXON WITH DISCRETIONARY RAISES ARE FALSE.

A.    Taylor's April 23, 2000, Raise Did Not Make Her "More Equal."

In 2000, Donoghue granted Georgina Taylor a discretionary raise of 50 cents per hour, which raised her rate of pay to $23.234 per hour. PFOF 76. Donoghue claimed that she (Donoghue) believed at the time that the purpose of an equity increase was to make an employee's pay "more equal" to others in her pay range with her same job title. PFOF 89.

However, Taylor's equity increase did not make her "more equal" to others in her pay range because, on the same day that Donoghue granted Taylor an equity increase of 50 cents per

hour, Donoghue granted James Chiolino a discretionary raise of $2.00 per hour based on equity, which allowed him to leapfrog over Taylor's pay to his new rate of $23.587 per hour. See PFOF 93. Donoghue provided a much larger equity increase to Chiolino than to Taylor, even though Taylor had 15 more years of experience as a State of Wisconsin employee and 19 more years of experience as a supervisor than did Chiolino. *Id.*

It may or may not be that, as Donoghue claimed at trial, the Personnel Section or Bureau of the Department of Workforce Development came to Donoghue and suggested that an increase on the basis of equity would be appropriate for Taylor, given Taylor's years of experience and her pay relative to others with her length of service as a State employee and as a supervisor. But one can hardly argue with a straight face that Taylor's raise actually effected some sort of equity, since Chiolino's raise, provided on the same date as Taylor's, undermined any attempt at equity in pay rates for supervisors in the Department.

B.   Chiolino's April 23, 2000, Raise Did Not Make Him "More Equal" Nor Did He
     Deserve the Raise Based on "Outstanding" or "Ongoing Exemplary Job
     Performance."

In her affidavit prior to trial, and again at trial, Donoghue claimed that she provided Chiolino with a raise in 2000 based on equity. PFOF 92. Specifically, she was asked this question and gave this answer on direct examination "And you previously testified that in the year 2000 you gave Chiolino an equity award, did you not?" "Yes." Tr. 297.

However, as noted above, Chiolino's raise of $2.00 per hour in 2000 did not make him "more equal." Instead, it made him *superior* to Taylor, and almost brought him, while still on probation, even with Kimble, who had been an ERD supervisor for over 20 years. PFOF 31, 94.

Furthermore, in her affidavit prior to trial, Donoghue stated that she gave Chiolino an equity raise in 2000 based on his "ongoing exemplary performance." PFOF 92. This contradicts

30

her testimony at trial that the purpose of an equity increase was to make an employee "more equal" with his or her co-workers in the same job title and pay range. She also testified that an equity increase had nothing to do with job performance. Tr. 295.

The record is devoid of any documentation related to the basis for providing an equity increase in 2000, or any documentation related to Taylor's and Chiolino's 2000 raises at all, other than their payroll records.

However, Chiolino's supervisor, Robert Anderson -- the person most likely to know whether Chiolino warranted a discretionary raise based on performance in 2000 -- stated that such a raise in 2000 was "premature." PFOF 101.

Finally, Donoghue claimed that Chiolino should have received an "equity" raise in 2000 because "he had just been promoted, and he had spent a year – a very difficult year with two or three very difficult employees." Tr. 297. However, Chiolino's difficulty with his employees was the same reason given for the discretionary raise in 2001, which raise *was* supposed to be based on his performance. Donoghue would have this court believe that Chiolino received one raise each in years 2000 and 2001, amounting to a total of $3.00 per hour, based on certain challenges with difficult employees, even though he had already received $2.792 per hour in raises in 1999 (see PFOF 88) just for becoming a supervisor, where ostensibly the reason for the raises upon his promotion were to compensate him for the headaches of supervising employees. This rationale is simply unbelievable and must be seen for what it is: false.

C.     Chiolino Did Not Deserve A Raise Based On "Outstanding" Performance or "Ongoing Exemplary Performance" in 2001.

By 2001, Robert Anderson believed that Chiolino was doing an outstanding job. PFOF 99. However, the annual review where Anderson identifies that Chiolino was doing an outstanding job indicates that one of the issues of concern was the challenge Chiolino faced with

31

certain employees. *Id.* Donoghue's nomination of Chiolino for the award in 2001 also identifies Chiolino's challenges with his employees for the award. PFOF 97.

By May 2001, the Department had developed written criteria for the provision of discretionary raises it was supposed to have created in 1999. Ex. 33, pp. 11-12, 22; Ex. 11. The description of Chiolino's activities which Donoghue claims were what warranted him the 2001 raise was consistent with the criteria for a lump sum award, not a base-building raise, as the rationale provided for the raise emphasized personnel issues, which should come to an end at some point. PFOF 97. If Chiolino was doing his job correctly, an employee's work performance issues should end with either improved performance or discharge – personnel problems should not be the kind of issue which would result in ongoing problems which warranted a permanent raise in pay rates extending well past the time when some extra pay was arguably warranted.

The additional $1.00 per hour Chiolino received in 2001 might have been more easily justified if he had not already received $4.79 per hour in increases between his 1999 non-supervisory pay and his post-2000-raise pay. Based on the fact that Chiolino had already received substantial raises in the past two years, plus the fact that the $1.00 per hour raise resulted in him leapfrogging over Kimble's pay, the court should conclude that that Chiolino should not have received a discretionary raise in 2001 if he was to be treated similarly to Kimble.

D. Dixon Did Not Deserve A Discretionary Raise Based On "Outstanding" Performance or Retention in 2002.

Donoghue's nomination for Dixon's 2002 discretionary raise identifies "meritorious performance" as the reason he received the raise of $1.00 per hour. PFOF 112, 115. Donoghue claimed that Dixon, like Chiolino in 2001, had successfully dealt with some personnel issues. Ex. 14.

In her pre-trial affidavit, Donoghue claimed that Dixon deserved the raise because he had shown "excellent performance" and that she was concerned he would leave the department, and thus the 2002 raise was intended to reward Dixon for his performance and to ensure his retention. PFOF 113.

At trial, Donoghue testified that the 2002 award for Dixon was really for retention, even though her nomination of Dixon for the 2002 award does not mention retention at all. PFOF 114, 115. The stark contrast between the reasons Donogue gave for Dixon's raise in 2001, the reasons she gave at summary judgment, and the reasons she gave at trial, severely undercuts the believability of her claims.

Dixon's supervisor, Robert Anderson – again the person who would have the best personal knowledge regarding whether Dixon deserved an award for excellent performance – said that Dixon did not meet the criteria for an award based on merit that had been identified by the Department by 2002. PFOF 118. Furthermore, during Dixon's first year of employment Anderson told Donoghue that Dixon's performance was only average, although when Anderson wrote Dixon's reviews he relied on his hopes for Dixon and indicated that Dixon was performing at an above average level. PFOF 119. Dixon's performance went downhill from there. PFOF 120. By 2004, Anderson considered Dixon's performance to be marginally satisfactory. Ex. 17. Furthermore, Dixon never mentioned anything to Anderson about considering retirement during Dixon's first year of employment. PFOF 121. Anderson would not have been sorry to see Dixon go, as a supervisor, because Dixon was reluctant to actually supervise his employees. PFOF 122.

The form Donoghue used to nominate Dixon for the discretionary raise identifies meritorious performance, not retention, as the basis for the award, even though retention is

33

clearly identified on the form as one of the bases for a grant of a discretionary raise. Ex. 14. There simply was no support for Donoghue's alleged belief that Dixon's performance was so exceptional that he deserved a raise based on merit, and her own nomination of Dixon for the discretionary raise undermines her claim that Dixon received the raise based on her concerns about his retention.

Donoghue's explanations simply cannot be credited.

C.    Summary

Similary situated employees outside of Kimble's protected class received systematically better treatment. None of the employees who received discretionary raises was African-American. All are of European descent, although Donoghue claimed that she (inaccurately) believed that Taylor "may have had" at least partial Native American origins, with no corroboration for that assertion. Tr. 76.

At the same time, Donoghue criticized the performance of the one other African-American male she supervised. The only person Donoghue identified as an employee with whom she had serious difficulties was Frank Humphrey, also an African-American male. Tr. 26-7. Humphrey transferred out of her department because of he and she did not get along. *Id.*

The consistency with which Donoghue provided discretionary raises to non-African-Americans, and her lack of regard or respect for the work of the few African-Americans males she dealt with further support the claim that she was influenced by illegal factors when she failed to provide Kimble with any discretionary raise.

III.    DONOGHUE'S TESTIMONY IS NOT BELIEVABLE.

A.  Donoghue's Shifting Reasons Indicate Untruthfulness.

34

The Seventh Circuit has held that, "when an employer gives one reason at the time of the adverse employment decision but later gives another which is unsupported by the documentary evidence a jury could reasonably conclude that the new reason was a pretextual, after-the-fact justification." *O'Neal v. City of New Albany,* 293 F.3d 998, 1005-06 (7th Cir. 2002), *citing Emmel v. Coca-Cola Bottling Co. of Chicago,* 95 F.3d 527, 534-35 (7th Cir. 1995); *Perfetti v. First Nat'l Bank of Chicago,* 950 F.2d 449, 456 (7th Cir. 1991). Furthermore, "because a fact-finder may infer intentional discrimination from an employer's untruthfulness, evidence that calls truthfulness into question precludes a summary judgment." *Id., citing Perdomo v. Browner,* 67 F.3d 140, 145 (7th Cir. 1994) and *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 147 (2000). Indeed, "the consistency of the explanation provided by an employer at the time of an employment decision and in an administrative proceeding is evidence of the veracity of the employer's explanation at summary judgment." *Zaccagnini v. Chas. Levy Circulating Co.,* 338 F.3d 672, 677 (7th Cir. 2003) *citing Stalter v. Wal-Mart Stores, Inc.,* 194 F.3d 285, 291 (7th Cir. 1999 and *Perfetti v. First Nat'l Bank of Chicago,* 950 F.2d 449, 456 (7th Cirr. 1991).

While the cases above primarily refer to summary judgment, the same shifting reasons doctrine applies when evaluating a witness's testimony at trial. If a witness gives differing answers to the same questions, her testimony has been impeached, and the court must question both versions of the sworn testimony.

1. Georgina Taylor

Prior to trial, Donoghue provided a sworn affidavit stating that she did *not* provide Taylor with a discretionary compensation award and only provided Taylor with an equity award. PFOF 79. However, this falsehood was exposed at summary judgment, as Taylor's payroll records clearly state that she *was* provided a discretionary compensation award. PFOF 76. At trial,

35

Donoghue acknowledged that she gave Taylor a "discretionary compensation award" and stated that it was based on equity. PFOF 79.

In the grand scheme of things, this falsehood is fairly discrete. Defendants will likely argue that this was an honest mistake, and Donoghue simply did not understand that an "equity" award was simply one type of discretionary compensation award. This argument also does not survive scrutiny, however, as Donoghue was expected to understand the rules of her department and abide by those rules – even if none of the other administrators did. Tr. 314-5; Ex. 33.

Donoghue's biggest problem is not word choice, but to whom she granted the discretionary raises. She ostensively gave Taylor an award based on equity, but gave Chiolino an award based on equity, at the same time, which moved Chiolino's wage rate higher than Taylor's and thus created further "inequity." Here, it is not Donoghue's testimony that gets her in trouble, but the record of her actions. It is simply impossible to square giving Taylor a 50 cent per hour raise based on "equity," and Chiolino a $2.00 per hour raise based on "equity" and performance *at the same time*.

Meanwhile, of course, Kimble received nothing. For him, no equity need apply.

2. James Chiolino and Michael Dixon

The circumstances surrounding the raises given to James Chiolino and Michael Dixon are strikingly similar to each other. Chiolino and Dixon were both given their initial discretionary raises even before they had completed their probationary periods as supervisors. PFOF 90, 125. In both cases, if their supervisor, Robert Anderson, had known about the proposed raises, he would have found them inappropriate; in the case of Chiolino, the raise was premature and in the case of Dixon, the raise was undeserved.

36

In the case of both Chiolino and Dixon, their discretionary raises allowed them to leapfrog over Kimble.

Donoghue never provided a reason why she gave discretionary raises to supervisors before they had even completed their probationary periods. As for Robert Anderson's opinions, Donoghue supposedly disagreed with him. But as for the fact that Chiolino and Dixon leapfrogged over Kimble in pay, *she simply did not care.* Tr. 318-9. It did not concern her at all.

In this way, Donoghue has undermined her own testimony, because she claimed that the reason she gave Taylor a discretionary raise was because she was concerned about how she was placed compared to other supervisors. Similarly, Donoghue made the same claim as to Chiolino. But as to Kimble, *she did not care.*

If Donoghue was truly being even-handed and making decisions based on equity and merit without regard to illegal discriminatory motives, she would have been concerned that she was creating an imbalance in wage rates. She would have been concerned when the raise she gave Chiolino undermined the purpose of the equity raise for Taylor. She would have been concerned that the raises she was giving Chiolino and Dixon allowed them to leapfrog ahead of Kimble, despite his years of service. But she was not the least concerned.

Based on Donoghue's alleged concern about "equity" for Taylor and Chiolino and her lack of concern about equity for Kimble, the court can and should conclude that Donoghue used "equity" as a pretext for providing discretionary raises regardless of the merits.

B. Donoghue's Testimony Is Contradicted by Documents She Signed.

Prior to trial, Donoghue signed an affidavit claiming that after she provided Kimble with a one-time cash payment as acknowledgment of his efforts to improve his writing and proof-reading skills in 1999, his performance "slipped markedly." PFOF 48. However, Kimble's

37

performance evaluations, received and initialed by Donoghue, indicate that Kimble consistently *improved* his performance each year.  PFOF 52, 54.  This is a crucial point, as Donoghue has linked his alleged failure in this area to her conclusion that his performance was not "outstanding," and thus he was not eligible for a discretionary raise.  Ex. 23, ¶6, ¶19.  Her testimony on this crucial point simply cannot be believed.

IV.    ADDITIONAL EVIDENCE OF DISCRIMINATORY MOTIVES

Plaintiff does not rely on the additional evidence of discriminatory motives, alone, as a basis for the court to determine that Defendants discriminated against Kimble when he was not provided with any discretionary raise.  The following pieces of evidence form part of a larger mosaic of evidence which shows that the Defendants acted illegally.

A.  Missing Evidence

1.  Documents

The court is entitled to draw negative inferences where parties do not produce evidence that, if helpful to that party, likely would have been produced.  As the *Miksis* court stated: "it should be enough that there is evidence that a party would surely have introduced had it been helpful, permitting an inference that the evidence would instead have helped his opponent." *Miksis v. Howard*, 106 F.3d 754, 763 (7th Cir. 1997) (when defendant failed to produce results of an allegedly exculpatory drug test, the court was entitled to the inference that the results would not actually have exculpated the defendant).  See also *Niehus v. Liberio,* 973 F.2d 526, 530 (7th Cir. 1992) (defendant police officers' failure to produce either the mug shots of the plaintiff or the allegedly broken camera that resulted in the missing mug shots gave rise to an inference that the mug shots, if produced, would have shown that the defendants had in fact battered the plaintiff), and *Doe v. Johnson*, 52 F.3d 1448, 1460-61 (7th Cir. 1995) (plaintiff's

failure to produce audio tapes of her sessions with her doctor gave rise to an inference that the tapes would contradict the plaintiff's testimony). Therefore if a party fails to produce evidence that should be helpful to its case, the court is entitled to make the inference that such evidence would instead be beneficial to the opposing party.

The first set of missing documents are the criteria that the Department was to have in place in 1999 prior to the grant of discretionary raises, any nomination forms with a written rationale for the awards based on "equity" to Chiolino and Taylor in 2000, and any evaluations for Chiolino for the same year which might show that he deserved a raise based on his performance. Logically, one would conclude that these documents would support Donoghue's testimony related to her reasons for granting raises to Chiolino and Taylor in 2000. The Defendants' failure to provide these documents gives rise to an inference that the documents would have harmed Defendants' case.

In addition, Donoghue has claimed that the reason Kimble did not get a discretionary raise was that his writing and proof-reading skills were deficient, especially as those skills related to the initial determinations. PFOF 49. However, the only writing samples in the record were submitted by Kimble, himself, and there were no problems identified with the samples provided. PFOF 53. Where, then, are these problematic initial determinations? This is not a case where the employee waited many months to file his claim and the Defendants were unable to locate and preserve evidence that might have supported their case. The Defendants themselves claim that Kimble's discrimination complaint was filed on April 21, 2005. See Order Denying Motion to Dismiss at 2. He retired shortly thereafter, and surely there would still have been initial determinations or other documents available for the Defendants to pull as examples

of his allegedly poor skills. Nevertheless, the Defendants were unable to provide any such examples.

Furthermore, Donoghue reported that one of the individuals who reported to her that there were problems with the initial determinations from Kimble's Milwaukee office was Chief Administrative Law Judge Pamela Rasche. Tr. 15. However, Rasche testified that she (Rasche) did not hold the opinion that the initial determinations which came out of the Kimble's Milwaukee office were particularly problematic, nor did she express that to Donoghue. Tr. 164.

The court can reasonably conclude that because the Defendants did not provide any such evidence at trial, that such supportive documents do not exist, and the thus reason given for failing to provide Kimble with a discretionary raise is untrue.

### 2. Ware Was A Missing Witness.

Kimble testified that he believed the reason he received a one-time cash payment from Donoghue for his performance in 1999 was because shortly before he received the award Donoghue had falsely accused him of being responsible for unacceptably old cases, and then when Ware told Donoghue that the cases were not from his office, but Taylor's, Donoghue responded by calling Kimble a "stupid idiot." PFOF 56. Donoghue denied calling him a "stupid idiot." PFOF 57. Ware was present at the meeting. PFOF 56.

Ware could have been called in the Defendants' case (as Defendants initially indicated was their plan) to confirm Donoghue's testimony and refute Kimble's, but she was not. Based on the Defendants' failure to call her or ask about her testimony on this point during the first day of trial, the court can and should infer that 1) Ware's testimony would *not* have helped the Defendants and 2) that Donoghue was not telling the truth.

40

B. The Defendants' Attempt to Manufacture Evidence.

Ware contacted Administrative Law Judge Pamela Rasche and told Rasche that Ware intended to identify three reasons that Kimble did not deserve a discretionary raise: 1) Kimble was not a good supervisor, 2) Kimble had poor writing skills and 3) Kimble had a volatile temper. PFOF 61.

At trial, Ware denied that she had ever given anyone a list of three things that made Kimble ineligible for a discretionary award. PFOF 62. She testified that she would not agree with a statement that Kimble was not a good supervisor. *Id.* She even acknowledged that any evidence related to Kimble's allegedly volatile temper was too old to have any relevance related to whether he might be eligible for a discretionary raise, although she had discussed this with Donoghue prior to the trial. Tr. 142, 144.

The court can conclude that the only reasons that the Defendants would have at that late date tried to explore new reasons for failing to provide Kimble with any discretionary raise was because they realized that the reasons provided earlier were unconvincing.

C. Ware Treated Kimble With Patronizing Disrespect.

During the last few years of her employment with the Equal Rights Division, Audrey Korczynski, a white clerical employee in the Milwaukee Civil Rights Office was supervised by Leanna Ware, although earlier she had been supervised by Johnny Kimble. Tr. 193-4. While Korczynski did not testify that Ware directly told her to "keep an eye on Johnny," Ware did ask Korczynski to "watch over what was happening in the Milwaukee office to make sure it was okay." *Id.* However, Korczynski never had an occasion to contact Ware and tell her that things were not "okay." *Id.* Further, Ware never advised Kimble that she had asked a clerical to

41

"watch over" the office which Kimble was charged with supervising, nor she did explain why or ask him if that was okay.

On another occasion, Ware went to so far as to tell Georgina Taylor that Ware was "embarrassed" for Kimble after a luncheon at the Madison Club because Kimble allegedly "hoarded" time. Tr. 183-4. It did not seem to Ms. Taylor that Kimble had gone on for a long time. Tr. 185. Again, Ware never talked to Kimble about the situation or her alleged concerns. Tr. 267.

These remarks and actions by Ware indicate a troubling and otherwise unexplained lack of respect for Kimble and his authority, especially when one considers that they were remarks made to people who were not Ware's peers. If Ware had concerns about "what was going on in the Milwaukee office," it was inappropriate for her to use a white subordinate as her spy. If Ware thought that Kimble's behavior at the luncheon was inappropriate or embarrassing, she could and should have talked to him about it directly, rather than to one if his peers, and not to him.

Ware's conduct, as the Defendant's direct supervisor over Kimble and the presumed conduit between Donoghue and Kimble, further calls into questions the legitimacy of Defendants' actions regarding the pay of the ERD supervisor.

D.  Donoghue's Secrecy

Donoghue's secrecy about the discretionary raises indicates that Donoghue was hiding something; as noted above, Donoghue did not consult with Leanna Ware or Robert Anderson, the immediate supervisors for Taylor, Kimble, Chiolino and Dixon, regarding either the various raises she granted or even the one-time cash award she provided to Kimble, even though she claims to have talked to Ware and others about Kimble's award.   Anderson did not find out

42

about the raise for Dixon until sometime in 2003, and he did not find out about the raises for Chiolino until after the instant lawsuit was filed. PFOF 100, 116. Ware testified that she was not consulted about the one-time cash award to Kimble, despite Donoghue's testimony to the contrary, and she was not notified of the equity raise for Taylor at the time it was granted. PFOF 81.

Furthermore, Donoghue's failure to consult with Ware and Anderson about granting discretionary raises indicates, at a minimum, that the actual performance of the supervisors as observed by their immediate superiors was not important to Donoghue's determination regarding whether the supervisors deserved discretionary raises. The court should interpret Donoghue's disregard for the assessments of Bureau Directors Ware and Anderson regarding the performance of the supervisors as evidence that performance was not the actual basis for the discretionary raises, despite Donoghue's claims to the contrary. Donoghue also testified that she did not review the personnel files of the ERD supervisors before determining who should receive the discretionary raises. Tr. 55. Thus, the court may also reasonably conclude that any allegations that Kimble's performance was not "outstanding" are irrelevant to a determination that he did not deserve an award, since performance was not the determining factor in whether an employee would be granted a discretionary raise.

III.    WHILE DEFENDANTS CLAIM THAT KIMBLE DID NOT MERIT A DISCRETIONARY RAISE BECAUSE HIS PERFORMANCE WAS NOT "OUTSTANDING," THE RECORD SHOWS THAT THIS CRITERION WAS NOT REQUIRED OF HIS COMPARATORS; JOHNNY KIMBLE DESERVED A DISCRETIONARY RAISE.

Unbeknownst to Johnny Kimble, Leanna Ware or Robert Anderson, by 2002 all of the comparable DWD supervisors in the Equal Rights Division were granted discretionary raises by

Donoghue, except for Johnny Kimble.[6]  Taylor and Dixon each got discretionary raises, and

Chiolino got two of them.  Even Lynn Hendrickson, supervisor of program support and

Donoghue's executive assistant, received two or three discretionary raises from Donoghue, such

that by 2002 Hendrickson, with her high school diploma, was making almost as much as Kimble,

who had a bachelor of science degree.  PFOF 128; Tr. 231.  In his 33 years in state service,

Kimble received several one-time cash awards for his excellent performance, but he never

received a discretionary raise.  PFOF 42, 35.

Kimble supervised 20 employees at the time of his retirement and at no time did he

supervise fewer than 16 employees.  PFOF 32.  By comparison, Taylor supervised 11-13

employees (PFOF 69), Chiolino supervised 12 employees (PFOF 87), and Dixon supervised two

to three employees.  PFOF 122.

Kimble had more longevity as a state employee than Taylor, Chiolino or Dixon.  Exs. 8,

10, 13, 22.  He had more experience as a supervisor than Taylor, Chiolino or Dixon.  *Id.*

Kimble's office was more productive than Taylor's.  PFOF 45.  Between 1999 and 2002,

Kimble's performance reviews indicated that each year he improved his writing skills, his

office's productivity, or both.  PFOF 52, 54.

In particular, Donoghue testified that there were certain objective criteria used to evaluate

Bureau Chiefs.  Specifically, the Department reviewed the time it took to process complaints at

the intake stage, and Kimble had better numbers in that regard than the Madison office did under

Georgina Taylor.  *Id.*  The Department also monitored how long investigations took to

completion and, again, Kimble had better numbers than the Madison office under Georgina

Taylor.  *Id.*  Between 1999 and 2000, Ware noted in Kimble's evaluation that his office reduced

---

[6] The other ERD supervisor was Pamela Rasche, but she was and is the Chief Administrative Law Judge, in a much higher category of qualifications and compensation, such that both parties agreed during the trial that she is not a comparable for Johnny Kimble, so her compensation history was not introduced.  See Tr. 167-8.

the average days for investigation of cases in the section from 159 to 138; between 2000 and

2001, the average days for investigation of cases went from 139 to 113 days; between 2001 and

2002, the average was only 112 days ("a new low!"). *Id.*

By 2002, the Department had developed new criteria for discretionary raises. Ex. 14.

Consistent with the criteria codified in 2001 (Ex. 11), the criteria allowed discretionary raises for

employees who showed "sustained exemplary performance." Ex. 11, 14. Kimble's record of

steady and sustained improvement, especially as against objective measures, surely showed

"sustained exemplary performance." Kimble submits that the reason he, and only he, did not get

a discretionary raise was because Defendants engaged in illegal discrimination.

Even if Donoghue did not believe that Kimble deserved a discretionary raise based on his

performance, Kimble certainly deserved a discretionary raise based on equity. Both of the least

senior supervisors, Chiolino and Dixon, leapfrogged past Kimble due to the discretionary raises

Donoghue gave them. Those are precisely the circumstances under which a discretionary raise

based on equity is warranted. As noted in the criteria developed by 2002, pay equity was defined

as "when the employee is determined to have a salary that is lower than other employee(s)

performing the same type of work." Ex. 14. Allowing Chiolino and Dixon to leapfrog over

Kimble was simply unwarranted; a discretionary raise based on equity should have been granted

if Kimble was treated the same as his non-African-American counterparts.

Donoghue testified that she did not consider Kimble for a discretionary raise based on

equity because he was "just one notch below the top of what he could receive at that time." Tr.

303-4. This is simply unbelievable. If that were true, then apparently she gave both Chiolino

and Dixon raises that would have put them at the top of the pay range or even over the top,

because they both leapfrogged over Kimble in the same job classification. Thus, Chiolino would

have been at, or over, the top of the pay range in 2001, after two years of service as a supervisor, when he received his raise to $25.466 per hour. PFOF 95. Similarly, Dixon would have been at, or over, the top of the pay range in 2002, after less than a year of service as a supervisor, when he received the raise that put his wage rate at $26.628 per hour. PFOF 110, 112.

It does not make sense to provide green supervisors with raises that put them at the top of the pay range for their classification, but to deny a seasoned supervisor the same kind of raise. Surely no greater case could be made for a discretionary raise based on equity. Any legitimate reason Donoghue could have had for failing to provide Kimble with a discretionary raise has been eliminated.

As noted in *Furnco, supra,* employers are assumed to act with some reason. Donoghue's preferred legitimate reasons have been proved untrue. Defendants have not offered any other reason to support the difference in their treatment of this African-American man compared to his counterparts who were white and of European ancestry. It is thus more likely than not that Donoghue's differential actions were due to illegal discrimination against Kimble.

## CONCLUSION

For all the foregoing reasons, plaintiff requests that this court find that the Defendants engaged in illegal discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and plaintiff's rights to equal protection under the law, brought to this court pursuant to 42 U.S.C. § 1983.

Date:   September 2, 2009

s/ Brenda Lewison

Attorney Brenda Lewison
SBN:   1025079

Law Office of Arthur Heitzer
633 W. Wisconsin Ave., Suite 1410
Milwaukee, WI  53203-1918
(414) 273-1040 x 14
(414) 273-4859 FAX
lewisonlaw@yahoo.com

ATTORNEY FOR THE PLAINTIFF