# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

**JOHNNY KIMBLE,**

              **Plaintiff,**

     **v.**                              **Case No. 07C0266**

**WISCONSIN DEPARTMENT OF
WORKFORCE DEVELOPMENT, and
J. SHEEHAN DONOGHUE,**
                     **Defendants.**

---

## FINDINGS AND CONCLUSIONS

Plaintiff Johnny Kimble, an African-American male and a long-time supervisor employed by the Equal Rights Division ("ERD"), a division of the Wisconsin Department of Workforce Development ("the Department"), brought this action against defendants, the Department and former ERD Administrator J. Sheehan Donoghue ("Donoghue"), alleging that defendants discriminated against him on the basis of race and gender by not giving him a raise. The parties agreed to a court trial and to bifurcate the issues of liability and damages. I conducted a trial on the liability issue and in this opinion state my findings and conclusions. See Fed. R. Civ. P. 52(a)(1).

## I. BACKGROUND

The Department is a state agency comprised of seven divisions, including the ERD. The ERD administers state anti-discrimination and related laws and is comprised of several bureaus, including the Civil Rights Bureau and the Labor Standards Bureau. The Civil

Rights Bureau investigates and adjudicates discrimination claims and has offices in Milwaukee, Madison and elsewhere.

Plaintiff, a section chief, supervised the Milwaukee office of the Civil Rights Bureau from 1976 until 2005 when he retired. Leanna Ware, a white female, was the Director of the Civil Rights Bureau. She worked out of Madison and supervised plaintiff. She also supervised Georgina Taylor, a female of Argentinian origin who supervised the Madison office of the Civil Rights Bureau.

Defendant Donoghue served as the ERD Administrator from 1991 until 2003. Previous to administering the ERD, she served in the Wisconsin Assembly. Donoghue worked out of Madison and supervised Ware. She also supervised the Director of the Labor Standards Bureau, Robert Anderson who, in turn, supervised the Chief of the Compliance Section of the Labor Standards Bureau, James Chiolino, a white male, and the Chief of the Construction Wage Rate Section, Mike Dixon, also a white male.

Other ERD employees included Pamela Rasche, Chief of the Hearing and Mediation Section of the Civil Rights Bureau, and Lynn Hendrickson, Donoghue's administrative assistant.

At all times relevant, state plans governed the compensation of the above named individuals. These plans contained provisions authorizing awards for meritorious performance, for reasons of equity, because of retention needs and for other reasons. The awards could be in the form of single lump sum payments (bonuses) or base-building increases in the employee's hourly wage (raises). The plans authorized Donoghue to grant both bonuses and raises.

During her twelve-year tenure, Donoghue granted a number of awards. Among others, she granted Taylor a $.50 per hour base-building raise in 2000; Chiolino a $2.00 per hour base-building raise in 2000 and a $1.00 per hour base-building rase in 2001; and Dixon a $1.00 per hour base-building raise in 2002. She did not grant any base-building awards to plaintiff. However, she did grant him a one-time $300 lump-sum payment in 1999.

For most of Donoghue's tenure, plaintiff was the only African-American male among ERD supervisors. In her first year as ERD administrator, Donoghue supervised another African-American male, Frank Humphrey, who served as her deputy. However, Humphrey transferred out of the ERD because he and Donoghue did not get along.

I will state additional facts in the course of the opinion.

## II. DISCUSSION

### A.    Liability Under Title VII

Title VII prohibits discrimination with respect to an individual's "compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or sex . . .." 42 U.S.C. § 2000e-2(a)(1). It further provides that a complainant may establish discrimination by demonstrating that race or sex "was a motivating factor . . . for the challenged employment practice." 42 U.S.C. § 2000e-2 (m). Thus, the trier of fact in a disparate treatment case under Title VII focuses on whether in making the decision at issue, the employer was motivated by the employee's race or gender or other protected characteristic. Raytheon Co. v. Hernandez, 540 U.S. 44, 52 (2003).[1]

---

[1]Plaintiff also asserts claims under 42 U.S.C. §§ 1981 and 1983. I will only discuss plaintiff's Title VII claim but note that the Title VII analysis also applies to the § 1981 and

A trier of fact need not determine whether the employer's explanation for the alleged discriminatory action is honest or dishonest. To impose liability, a factfinder need only determine that the employer made the challenged decision based on a protected trait. 42 U.S.C. §§ 2000-e(a)(1); see also Melissa Hart, Subjective Decision Making & Unconscious Discrimination, 56 Ala. L. Rev. 741, 755 (2005).

Nor must a trier of fact decide whether a decision-maker acted purposely or based on stereotypical attitudes of which he or she was partially or entirely unaware. See Thomas v. Eastman-Kodak, 183 F.3d 38, 58 (1st Cir. 1999) (stating that a subjective judgment resulting in discrimination against a black plaintiff is unlawful "regardless of whether the employer consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias"); see also Hart, supra, at 771 (stating "that in a subjective evaluation system, there is a risk that evaluations will be based on unconscious discriminatory attitudes and that a process infected by this subtle bias is no more permissible than a decision influenced by conscious racism or sexism").

Rather, in determining whether an employer engaged in disparate treatment, the critical inquiry is whether its decision was affected by the employee's membership in a protected class. The trier of fact simply asks whether, based on the evidence presented, it is more probable than not that the employer committed a discriminatory act.

A Title VII plaintiff may prove discrimination by means of circumstantial evidence. Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003). One way of doing this is by first presenting a prima facie case of discrimination and then showing that the defendant's

§ 1983 claims. Patton v. Indianapolis Pub. Sch. Bd., 276 F.3d 334, 338 (7th Cir. 2002) (§ 1981 claims); Lewis v. City of Chi., 496 F.3d 645, 650 (7th Cir. 2007) (§ 1983 claims).

4

explanation for the alleged discriminatory act is unconvincing. As the Supreme Court explained in Reeves v. Sanderson Plumbing Prods., 530 U.S. 133, 148 (2000),

> once the employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision. Cf. Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978) ("[W]hen all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts with some reason, based his decision on an impermissible consideration"). Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.

As stated, in the present case, plaintiff contends that defendants discriminated against him in violation of Title VII by failing to provide him with a raise based on his race and gender. As in most Title VII cases, plaintiff relies on circumstantial evidence. He attempts to prove discrimination by presenting a prima facie case and showing that defendants' explanation for the alleged discriminatory act is so weak that the trier of fact may reasonably infer that the real reason plaintiff did not receive a raise was race and gender.

**B.      Prima Facie Case**

To establish a prima facie case of discrimination, plaintiff must show that: (1) he is a member of a protected class; (2) he performed his job satisfactorily; (3) he suffered an adverse employment action; and (4) the adverse employment action and the protected classification were causally connected. He may establish the fourth factor by showing that a similarly situated employee who is not a member of the protected class received more favorable treatment. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 801 (1973).

With respect to the first element, defendants concede that as an African-American, plaintiff is a member of a protected class, but they express skepticism about his gender-based claim. However, defendants misconstrue the nature of plaintiff's claim. Plaintiff does not assert a claim of gender discrimination separate from his race-based claim. Rather, he complains that defendants discriminated against him based on the combination of his race and gender, i.e., because he is an African-American male. In Title VII parlance, plaintiff asserts a "race plus" claim. The Fifth Circuit originally identified this type of claim in 1980 in Jefferies v. Harris County Community Action Ass'n, 615 F.2d 1025 (5th Cir. 1980). The court analogized to Phillips v. Martin Marietta Corp., 400 U.S. 542 (1971), which defined a protected "sex-plus" category and found that the overlap between race and another protected classification could constitute a separate class protected by Title VII. Barbara T. Lindemann & Paul Grossman, Employment Discrimination Law, at 286 (4th ed. Vol. 1, 2007).

The Jefferies court stated that discrimination against black females could exist "even in the absence of discrimination against black men or white women." Jefferies, 615 F.2d at 1032-33. Or, as another court put it, "some characteristics, such as race, color, and national origin, often fuse inextricably. Made flesh in a person, they indivisibly intermingle. The meaning of the statute is plain and unambiguous. Title VII prohibits employment discrimination based on any of the named characteristics, whether individually or in combination." Jeffers v. Thompson, 264 F. Supp. 2d 314, 326 (D. Md. 2003); see also Goodwin v. Bd. of Trs. of Univ. of Ill., 442 F.3d 611, 619 (7th Cir. 2006) (discussing discrimination against an African-American woman regarded as a "strong black female").

The EEOC characterizes this type of discrimination as "intersectional discrimination":

6

Title VII prohibits discrimination not just because of one protected trait (e.g., race), but also because of the intersection of two or more protected bases (e.g., race and sex). For example, Title VII prohibits discrimination against African American women even if the employer does not discriminate against White women or African American men. Likewise, Title VII protects Asian American women from discrimination based on stereotypes and assumptions about them "even in the absence of discrimination against Asian American men or White women." The law also prohibits individuals from being subjected to discrimination because of the intersection of their race and a trait covered by another EEO statute e.g., race and disability, or race and age.

EEOC Compliance Manual, Ch. 15, at http://www.eeoc.gov/policy/docs/race-color.html (last visited October 23, 2009).

African-American men, like African-American women, may bring intersectional claims. See Long v. A.T.&T. Info. Sys., Inc., 733 F. Supp. 188 (S.D.N.Y. 1990). It is sometimes mistakenly thought that the black male experience represents a mere racial variation on the white male experience and that black men suffer from discrimination only because they are black. Conceptualizing separate over-lapping black and male categories has sometimes interfered with the recognition that certain distinctive features of being black and male serve as the target for discrimination. Jesse B. Semple, Note, Invisible Man: Black & Male Under Title VII, 104 Harv. L. Rev. 749, 751 (1990-91).

In fact, scholars have long recognized that black males are subject to distinct stereotypes. For example, some white Americans believe that black males are less intelligent than other groups, including black females. Pamela J. Smith, Part II – Romantic Paternalism The Ties That Bind: Hierarchies of Economic Oppression That Reveal Judicial Disaffinity for Black Women & Men, 3J Gender, Race & Justice 181, 254 (1999-2000); see also Floyd D. Weatherspoon, Remedying Employment Discrimination Against African-American Males: Stereotypical Bases Engender a Case of Race Plus Sex Discrimination,

7

36 Washburn L.J. 23, 41 (1996) (stating that because America "remains a segregated society . . . stereotypical biases dominate selection and promotional processes to the exclusion of African-American males who are veiled with images of incompetency"). As a result, black males are sometimes monitored more closely than members of other groups. Id. at 31. Other stereotypical attitudes focus on cultural styles – black men are sometimes thought to be more direct, expressive and assertive than white men, Semple, supra, at 756 – and on black male uncontrollability as, for example, having a bad temper, Smith, supra, at 21.

As stated, in the present case, plaintiff alleges that he was discriminated against based on a combination of race and gender. As also stated, Title VII prohibits discrimination based on race and gender whether individually or in combination. Jeffers, 262 F. Supp. 2d at 326. Thus, plaintiff establishes the first element of a prima facie case, that he is a member of a protected class.

Turning to the second element, defendant does not dispute that plaintiff performed his job satisfactorily, and the evidence indicates that this is so.

To establish the third element, plaintiff must show that he suffered an adverse employment action. Plaintiff contends that Donoghue's failure to give him a base-building raise as opposed to a one-time bonus in the twelve years that she administered the ERD constitutes an adverse employment action. In their post-trial brief, defendants do not dispute this, and the evidence indicates that plaintiff indeed suffered such an action. A denied raise is an adverse employment action. Farrell v. Butler Univ., 421 F.3d 609, 614 (7th Cir. 2005). And an award that "bestows . . . a permanent increase in base salary strongly suggests that the reward is a raise." Id. Although Donoghue gave many other

8

employees base-building raises, she gave plaintiff only a one-time $300 bonus. Her failure to give him a raise affected his pay and an employment action that affects an employee's pay, even by a small amount, is generally considered adverse. See, e.g., Russell v. Bd. of Trs. of Univ. of Ill. at Chi., 243 F.3d 336, 341 (7th Cir. 2001). Thus, plaintiff establishes a materially adverse employment action.

To satisfy the final requirement of the prima facie case, plaintiff must show that employees similarly situated to him who are not members of a protected class received more favorable treatment than he did. A similarly-situated employee is one who is "directly comparable to the plaintiff in all material respects." Boumehdi v. Plastag Holdings, LLC, 489 F.3d 781, 791 (7th Cir. 2007). In determining whether an employee is similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617 (7th Cir. 2000). For example, a court may consider whether the employee and the plaintiff had similar job responsibilities, the same supervisor, and similar performance. Boumehdi, 489 F.3d at 791. To establish that an employee is similarly situated, however, a plaintiff comparing himself to a better treated employee need not show complete identity, but only substantial similarity. Radue, 219 F.3d at 618.

Plaintiff offers three comparators: Georgina Taylor, Jim Chiolino and Mike Dixon. Defendant concedes that Taylor is a similarly situated employee, but argues that Chiolino and Dixon are not because they worked in a different Bureau, enforced different laws and had a different immediate supervisor. However, the evidence indicates that Chiolino and Dixon are sufficiently similar to plaintiff to serve as comparators. Although Chiolino and Dixon worked in a different Bureau in the ERD, their jobs were classified in the same

9

category as plaintiff's and required the same skills. Chiolino, Dixon and plaintiff were all equal rights supervisors and were similarly situated in the hierarchy relative to Donoghue. They performed similar functions – training staff, managing staff conflict, establishing procedures, reviewing the work of subordinates, evaluating staff performance and generally ensuring that the work force that they supervised functioned smoothly. They also managed complex cases and handled public relations for their respective offices. And in fact, Chiolino transferred laterally from his supervisory position at the Labor Standards Bureau into a supervisory position at the Civil Rights Bureau.

As previously stated, Donoghue gave base-building raises to Taylor, Chiolino and Dixon but only a modest one-time bonus to plaintiff. Thus, plaintiff presents sufficient evidence to establish a prima facie case of discrimination. As discussed, under Reeves, plaintiff can prevail if he also establishes that the justification offered by defendants for the alleged discriminatory act is unconvincing. Therefore, I turn to defendants' explanation.

## C.    Defendants' Explanation

Donoghue's explanation for providing one or more base-building raises to the comparators (and to others such as her administrative assistant, Lynn Hendrickson, who received two and possibly three raises) and none to plaintiff is that for various reasons, the comparators and others deserved raises but that plaintiff did not perform his job well enough to merit one. However, I find this explanation unconvincing. Donoghue was not a credible witness. In almost every major area of her testimony, she contradicted herself and/or was contradicted by other witnesses. In addition, she was frequently evasive and sometimes defensive. And, the other evidence in the record does not support her testimony.

10

Plaintiff's counsel first questioned Donoghue about the procedure she employed for determining raises and bonuses, noting that the state compensation plans contained only the most general standards and directed the Department to establish criteria. Donoghue initially answered that the Department had established a written policy regarding compensation awards and that when she granted or denied raises and bonuses she followed the policy. However, she subsequently backtracked and acknowledged that the Department had not actually formulated any policy.

She then testified that her policy was to ask supervisors to recommend employees who they believed deserved raises or bonuses. However, no supervisor testified that Donoghue had asked for such recommendations, and Civil Rights Bureau Director Leanna Ware testified that Donoghue not only did not ask her for recommendations but in fact told her that the Department had limited funds, and that raises and bonuses were unavailable. Ware also testified that although she supervised Georgina Taylor, Donoghue did not consult with her about giving Taylor a raise and that she did not learn that Donoghue had granted Taylor a raise until after Donoghue left state employment.

Finally, Donoghue testified that any award she granted had to be approved by the Department Secretary and the Department personnel office, suggesting that her discretion to grant raises and bonuses was subject to rules and standards. However, she subsequently acknowledged that review of her decisions was at most perfunctory and that her discretion was virtually unchecked.

Donoghue's testimony about her understanding of plaintiff's job was also both contradictory and contradicted. She first testified that she understood that plaintiff was supposed to personally review the initial determinations of all discrimination complaints

11

filed.  However, she soon backtracked on this testimony, stating that plaintiff was supposed to review all initial determinations except those prepared by certain employees who had good writing skills.  And when plaintiff's counsel then asked her whether this was true for the twelve years that she was the Administrator and plaintiff the section chief she responded: "That was my understanding," (Id. at 17), and that she got this understanding from Leanna Ware.  However, Ware testified that it was not part of plaintiff's duties to review all initial determinations except those prepared by certain employees.  She stated that section chiefs were supposed to perform only occasional spot-checks on initial determinations.

Donoghue also testified that her view of plaintiff's performance was shaped by the reports of others, primarily Ware, who wrote all of plaintiff's annual evaluations.  She testified that based on Ware's reports and a complaint from Pamela Rasche about the quality of the writing coming out of the Milwaukee office, she "felt that Johnny's technical skills were not always as sharp or acute as I would have liked."  (Id. at 11.)  However, Ware's evaluations of plaintiff were mainly positive, and Rasche credibly testified that she never complained about the Milwaukee office's written work.  And, in response to questioning from plaintiff's counsel, Donoghue acknowledged that plaintiff ran the Milwaukee office efficiently such that it timely completed its work – more so that the Madison office – and that plaintiff did a good job in maintaining a team spirit in the office.

Donoghue's testimony regarding the $300 bonus that she awarded plaintiff in June 1999 and her failure to give plaintiff any increases in compensation thereafter is also unworthy of belief.  Donoghue testified that she authorized the bonus in recognition of plaintiff's improved writing.  However, Donoghue had no first-hand acquaintance with

12

plaintiff's writing, and Ware testified credibly that Donoghue gave plaintiff the bonus without consulting her. Donoghue also acknowledged that she did not tell plaintiff that the bonus was for his improved writing. She also acknowledged that she did not personally communicate with plaintiff about the bonus. Donoghue also testified that she consulted with Ware about the bonus and that in fact it might have been Ware's idea. However, as stated, Ware testified that Donoghue did not consult with her about the matter or even disclose the payment to her and that she found out about it only after Donoghue left the Division.

Donoghue acknowledged meeting with plaintiff and Ware in her office shortly before she awarded the bonus. Plaintiff's counsel asked her whether at such meeting she chastised plaintiff for not timely completing certain investigations and whether Ware intervened and advised her that the investigations in question were not from the Milwaukee office. Donoghue responded that she did not recall the incident. She also denied that at the meeting she called plaintiff a stupid idiot or words to that effect. She further denied that she ever yelled at employees.

However, Ware testified that while she did not remember that particular meeting, timeliness was always a major concern. In addition, she and other witnesses credibly testified that Donoghue frequently yelled at employees and had a reputation for doing so. And plaintiff testified that shortly before he received the bonus, Donoghue summoned him to Madison and "began to rant and rave" about old cases, that Ware spoke up "and said that I was not the person she should be talking to," and that Donoghue called him a stupid idiot. (Trial Tr. vol. 2, 260-61, Jul. 14, 2009.) I found plaintiff's testimony to be credible.

13

Plaintiff's counsel then asked Donoghue why after plaintiff improved his writing sufficiently to warrant a bonus, she provided him with no further increases in compensation. Donoghue referred to an affidavit that she had submitted in which she stated "unfortunately his [plaintiff's] performance slipped markedly after that award and never approached the level of where I would have been justified in granting another award." (Donoghue Aff; Trial Tr. vol. 1, 49, Jul. 14, 2009.) However, plaintiff's evaluation for the year following the June 1999 bonus states that he continued to make progress toward achieving a number of significant goals, including improving his writing and proofreading skills. And Ware credibly testified that in the years following the bonus, plaintiff's evaluations were generally good and that his job performance did not slip. Thus, like her testimony regarding the reason for the bonus, Donoghue's version of the bonus's aftermath lacks credibility.

Donoghue's explanation of the raises she gave other employees also raises questions. Before trial, Donoghue denied granting Georgina Taylor a raise but at trial acknowledged giving Taylor a $.50 per hour raise in 2000 based on equity. However, like Taylor, plaintiff earned less than Chiolino and Dixon despite having far more experience than either. In addition plaintiff, a section chief, earned only slightly more than Donoghue's administrative assistant, Hendrickson. Further, Donoghue admitted that the Milwaukee office processed complaints more efficiently than the Madison office did and that Taylor had difficulty performing her responsibilities. However, Donoghue stated that she did not review Taylor's evaluations before awarding the raise.

Regarding the $2.00 per hour raise she awarded Chiolino in 2000, Donoghue also offered conflicting testimony. Before trial, she said it was an equity increase based on

14

exemplary job performance, but at trial, she said equity increases were not based on performance but were designed to equalize the pay of employees in the same job category. However, the $2.00 increase allowed Chiolino to leapfrog ahead of Taylor, who had nineteen more years of experience as a supervisor, and the $2.00 increase combined with the $1.00 per hour increase Donoghue gave him in 2001 allowed Chiolino to leapfrog ahead of plaintiff, who had twenty-three more years of experience as a supervisor. Donoghue vacillated between saying that the raise was based on equity or performance. Further, Donoghue acknowledged that she did not tell Chiolino's supervisor, Robert Anderson, about the raises she gave Chiolino and that when she gave him the first raise, he had not yet completed his one-year probationary period as a supervisor. Anderson testified that had he known of the 2000 raise, he would have opposed it.

Donoghue's explanation of the $1.00 per hour raise she awarded Dixon in 2001 is no more convincing than her other explanations. She testified that it was based on Dixon's performance but also on retention concerns. However, the documentation of the raise says nothing about retention, and Dixon's supervisor, Anderson (who again was not informed of the raise), testified that there was no reason to believe that Dixon might retire or leave the Division and that in fact Dixon had just been promoted to the supervisor position. Justifying the raise based on performance also raises questions. First, Dixon had not even completed his probationary period. Further, Anderson testified that Dixon was not a good supervisor and avoided addressing a number of staff problems. And after first testifying that she did not know of Anderson's negative view of Dixon's supervisory skills, Donoghue herself admitted that Dixon was not a good supervisor and that Anderson frequently came by her office to complain about Dixon.

15

Not only is Donoghue's testimony unpersuasive, her demeanor as a witness did not inspire confidence. She was often maddeningly evasive as indicated by the following colloquy with plaintiff's counsel:

> Q.     And would you agree that [efficiency] was a major concern and emphasis in terms of evaluating the leadership of those two offices [Milwaukee and Madison]?
>
> A.     I don't think that was a major concern in my evaluation of the leadership of those two offices, no.
>
> Q.     Was it Ms. Ware's?
>
> A.     I'm sorry.
>
> Q.     You agree it was Ms. Ware the person who supervised them?
>
> A.     I cannot speak for Leanna Ware.
>
> Q.     Did you ever talk to her about what she thought was most important -
>
> A.     I often talked to her.
>
> Q.     – in evaluating how the offices functioned?
>
> A.     We often –
>
> Q.     You did or didn't understand what Ms. Ware thought were the major emphasis in judging how well these offices were functioning?
>
> A.     I did understand.
>
> Q.     Now, isn't it true that in Ms. Ware's view the efficiency/proficiency of these numbers was a major objective in how these offices were functioning as you understood her perspective?
>
> A.     You would have to ask Ms. Ware.

(Trial. Tr. vol. 1, 69-70, Jul. 13, 2009.)

As the foregoing discussion indicates, Donoghue's explanation of her decisions regarding compensation awards to employees and specifically her decision not to grant

16

plaintiff a base-building raise is not convincing. She acknowledged that plaintiff's office processed its work in a timely manner and that plaintiff did a good job in maintaining a team spirit in the office. She also acknowledged that processing work efficiently was a very important Division goal. She justified her actions with respect to plaintiff by pointing to his alleged deficiencies in proofreading and writing. However, as discussed, she misunderstood the nature of his proof-reading duties and overstated the significance of this aspect of his job. And, the information that she cited to justify her criticism of plaintiff's writing – Ware's evaluations and a complaint from Rasche, which Rasche denied making – offers limited support for it. Further, Donoghue's testimony that plaintiff's performance slipped markedly after she granted him a bonus is entirely unsupported by the evidence. Thus, Donoghue's explanation for her compensation decisions regarding plaintiff is unconvincing – so much so that I may legitimately infer that the real reason for her decisions was plaintiff's protected status. <u>Reeves</u>, 530 U.S. at 148.

Because plaintiff presents a prima facie case of discrimination and defendants' explanation for the challenged conduct must be eliminated, I conclude that plaintiff meets his burden of establishing unlawful discrimination.

**D.    Additional Evidence**

Although my rejection of defendants' explanation is a sufficient basis for finding liability, I will discuss other aspects of the case because I believe they help to provide a fuller explanation of the challenged decision.

As previously indicated, when the evaluation of employees is highly subjective, there is a risk that supervisors will make judgments based on stereotypes of which they may or may not be entirely aware. <u>Thomas v. Troy City Bd. Of Educ.</u>, 302 F. Supp. 2d 1303, 1309

17

(M.D. Ala. 2004); Hart, supra, at 771; see also United States v. Stephens, 421 F.3d 503, 515 (7th Cir. 2005) (stating that "[u]nfortunately, racial stereotyping and unconscious bias is not limited to one particular area of society . . . the evidence of continued racial stereotyping in employment, housing, insurance and many other areas makes that apparent").  Further, stereotyping can constitute evidence of discrimination.  See, e.g., Price Waterhouse v. Hopkins, 490 U.S. 228, 250-52 (1989); see also Spearman v. Ford Motor Co., 231 F.3d 1080, 1085 (7th Cir. 2000).

As also discussed, in the present case the process by which Donoghue made decisions regarding compensation awards could hardly have been more subjective.  No written criteria governed such decisions, and Donoghue consulted no one about them, not even the affected employees' immediate supervisors.  Nor were the decisions subject to meaningful review.

With respect to the operation of stereotypes in the employment context, most scholars believe that stereotyping is a form of categorizing.  Individuals draw lines and create categories based in part on race, gender and ethnicity, and the stereotypes they create can bias how they process and interpret information and how they judge other people.  Linda Hamilton Krieger, The Content of Our Categories: A Cognitive Bias Approach to Discrimination & Equal Employment Opportunity, 47 Stan. L. Rev. 1161, 1188-90 (1995); see also Samuel R. Bagenstos, The Structural Turn & The Limits of Antidiscrimination Law, 94 Cal. L. Rev. 1 (2006); Samuel R. Bagenstos, Implicit Bias & Antidiscrimination Law, Harv. L. & Pol'y Rev. 477 (2007); Anthony G. Greenwald & Linda Hamilton Krieger, Implicit Bias: Scientific Foundations, 94 Cal. L. Rev. 945 (2006); Hart,

18

supra, at 742; Christine Jolls & Cass Sunstein, <u>The Law of Implicit Bias</u>, 94 Cal. L. Rev. 969, 986 (2006); Amy L. Wax, <u>Discrimination As Accident</u>, 74 Ind. L. J. 1129 (1999).

A supervisor's view of an employee may be affected by such lines and categories whether or not the supervisor is fully aware that this is so. Krieger cites the example of a Salvadoran who was the only nonwhite employee at his workplace. Although he made mistakes, so did the other employees. However, his supervisor uniformly reprimanded him for his mistakes and later declined to promote him and ultimately terminated him while overlooking the white employees' mistakes. His supervisor also ignored his achievements or attributed them to others, while commending white employees for similar achievements. While the supervisor may have intentionally discriminated against the Salvadoran, he might also have treated him poorly because he viewed him through the lens of an uncomplimentary stereotype, making him less likely to notice the Salvadoran's achievements relative to those of the white employees and more likely to treat his mistakes harshly.

The evidence suggests that something similar occurred in the present case. Donoghue seemed to regard plaintiff as if he were "veiled with images of incompetency." Weatherspoon, <u>supra</u>, at 41. I reach this conclusion for several reasons. First, throughout her twelve years as ERD Administrator, Donoghue avoided one-on-one interaction with plaintiff, even though he was a member of her management team, which consisted of no more than nine people. She testified that during her twelve-year tenure as Administrator, she never once met individually with plaintiff other than to "leave my purse and papers in his office" (Trial Tr. vol. 1, 12, Jul. 13, 2009) when she visited Milwaukee. Donoghue did not personally meet with plaintiff even when awarding him a bonus.

19

Donoghue also took little interest in plaintiff. The following colloquy with plaintiff's counsel is revealing in this respect:

> Q.  By the way, do you know that prior to the time that you became the administrator of ERD that Mr. Kimble had received five separate discretionary pay awards before you took over?
>
> A.  No.
>
> Q.  And –
>
> A.  How would I know that?
>
> Q.  Maybe by looking in his file, maybe by talking to him, maybe by talking to others.
>
> A.  I am not aware of that.

(Trial Tr. vol. I, 41, Jul. 13, 2009.)

Donoghue's behavior caused plaintiff to conclude that she was uninterested in what he had to say. Plaintiff credibly testified that because of Donoghue's reactions, over time, he became a less active participant in management meetings. "She was either impatient or listening to my response only to formulate her response to my response, and the fact most of the time when I said something, unless someone else in the room corroborated, it was like I was the invisible man, and it wasn't heard." (Trial Tr. vol. 2, 240-41, Jul. 14, 2009.)

Plaintiff then gave two examples:

> THE WITNESS:  . . . . The first is when we were at a management meeting, and I made the statement that we had difficulty getting technical support help in the Milwaukee office; and the response I got was that I can't believe that. But when a co-worker, Jim Chiolino, acknowledged that in Milwaukee we can make a telephone call to technical support in Madison and wait up to two weeks to get a response, it was then believed.

(Id. at 242-43.) Concerning the second, plaintiff testified as follows:

> A.    Yes, I made a recommendation or a suggestion that we develop a newsletter for the department, I mean for the division, because we wanted to have some way of getting out the word that we were doing a good job, and the comment went unnoticed when I said it; but halfway through the meeting when somebody else said it, then it became a good idea.

(Id. at 244.)

Donoghue's testimony about plaintiff's admission that his participation in management meetings declined over time is also instructive. She stated that she did not notice any change in his level of participation.

Further, like the Salvadoran's supervisor, Donoghue was quick to blame plaintiff, sometimes before discovering all the facts, while at the same time overlooking the faults of supervisors who were not black males. For example, she criticized plaintiff's proofreading skills based in part on the mistaken assumption that it was his duty to review every initial determination drafted by the Milwaukee office's staff. And she criticized his writing based in part on a complaint that the alleged complainant, Pamela Rasche, denied making. And, she berated plaintiff about the Milwaukee office's failure to complete certain investigations in a timely manner when the failure at issue was that of a different office. On the other hand, she gave Taylor a raise without reviewing her less than stellar performance evaluations, and she gave Dixon a raise even though she herself stated that he was not a good supervisor.

It is in itself curious that Donoghue placed so much emphasis on plaintiff's proofreading and writing and so little on his acknowledged ability to run the Milwaukee office efficiently and maintain good staff morale. It may well have been because she viewed him through the lens of an uncomplimentary stereotype. See Wax, supra, at 1131 (stating that "a supervisor might unconsciously place more weight on errors in grammar or

21

spelling in a memo prepared by a Hispanic clerk than in a document submitted by an Anglo counterpart").

Donoghue was also grudging about acknowledging plaintiff's achievements although she readily praised like accomplishments of white supervisors. For example, when she discussed the raise that she granted Dixon, she emphasized that he had created a good environment in the office and good staff morale. But when asked whether plaintiff had made a similar contribution, she responded that the environment in an office and the morale of a staff is the product of the efforts of all of the members of the team, not one particular person.

Thus, in addition to failing to provide a credible explanation of the conduct complained of, Donoghue behaved in a manner suggesting the presence of implicit bias.

### III. CONCLUSION

Thus, for the reasons stated, I conclude that plaintiff establishes that defendants discriminated against him in violation of Title VII.

Dated at Milwaukee, Wisconsin, this 25 day of February, 2010.


/s_____
LYNN ADELMAN
District Judge

22